**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DIVISION OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TEXAS CLOTHING HOLDING CORP.,** | § § § § | |
| ***Plaintiff*,** | § § | |
| | § | **Civil Action No. _____** |
| **v.** | § § | |
| **ZURICH AMERICAN INSURANCE COMPANY** | § § § | |
| ***Defendant*.** | § § § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Texas Clothing Holding Corp. ("Texas Clothing" or "Plaintiff") files this Complaint against Defendant Zurich American Insurance Company ("Zurich" or "Insurer"), seeking declaratory judgment that Zurich is obligated to provide coverage to Texas Clothing for losses due to Coronavirus and COVID-19 and damages for Zurich's breach of its insurance policy contract with Texas Clothing by failing to do so, and in support alleges as follows:

### I.      INTRODUCTION

1.      Texas Clothing, a Delaware corporation with its headquarters in Farmers Branch, Texas, is owned by Kinston Acquisition LLC, a Randa Apparel & Accessories fashion group company ("Randa"), a global powerhouse and one of the world's leading fashion clothing and lifestyle accessories groups, which includes a portfolio of over 40 owned or licensed brands across all channels of distribution, including the Haggar® brand ("Haggar").

2.      Texas Clothing's business earns revenue though: (1) the operation of Haggar-branded stores (the "Haggar Stores" or "Stores") in, at the time of the emergence of the SARS-CoV-2 virus ("Coronavirus") and the disease it causes, Coronavirus Disease 2019 ("COVID-19"), twenty-nine states throughout the U.S. and (2) the operation of a much larger wholesale business, producing fashion apparel

and accessories for sale in its customers' stores, which include many well-known names such as Kohl's, JCPenney and Costco.

3.      This Complaint arises from Zurich's denial of coverage for Texas Clothing's losses arising from Coronavirus and COVID-19, and the direct physical loss of or damage to property and business interruption they caused under the "all-risk" insurance policy Zurich sold to Texas Clothing (the "Policy").

4.      On January 21, 2020, the first case of COVID-19 was identified in the United States.  By the end of March 2020, non-essential businesses, schools, and places of worship closed their doors in an effort to stop the proliferation of the deadly virus, which spreads through aerosols or droplets from infected persons, remaining in the air and on surfaces for hours to days, and consistently reintroduced by infected persons.  Coronavirus invaded, transformed, physically altered and damaged the air and surfaces of indoor spaces of Texas Clothing's properties, rendering them uninhabitable and unfit for their intended purposes.  The presence of the virus on Texas Clothing's premises caused physical loss of or damage to Texas Clothing's properties, triggering property and business interruption coverage under the insurance policy sold to Texas Clothing by Zurich.

5.      The policy sold by Zurich is a high-end, "all risk" commercial property insurance policy, with exorbitant premiums, covering Texas Clothing's properties and the income stream from Texas Clothing's activities on the insured properties.  The Policy covers business interruption losses from the slowdown of Texas Clothing's subsidiaries' business activities, as well as the complete cessation of such activities, caused by physical loss of or damage to Texas Clothing's properties as wrought by Coronavirus and COVID-19.

6.      Due to the physical loss of or damage to Texas Clothing's properties caused by the presence of the virus, the Haggar Stores were completely closed from March 18, 2020 to May 22, 2020 (and some until well into June), and all of the Haggar Stores, when they reopened, operated at reduced capacity with strict limitations on use.  As a result, Texas Clothing suffered massive losses.  But when Texas Clothing turned to its insurance carrier for coverage, reasonably expecting its high-end insurance policy to compensate it for its losses from Coronavirus and COVID-19, Zurich turned its backs on Texas Clothing and denied its claims.

7.      At the same time they were denying claims, Zurich and other industry insurers, upon information and belief, were raising premiums following the emergence of Coronavirus and COVID-19. The result of Zurich's and the other insurers' behavior (i.e., denying claims and raising premiums) is a profit bonanza of historic proportions, that belies the insurance industry's repeated and false warnings to courts and the media that paying Coronavirus and COVID-19-related claims would bankrupt them and shatter the insurance market.  In reality, Zurich and other insurers have been recording record profits.

8.      By way of example only, on February 10, 2022, Zurich Insurance Group ("Zurich Ins. Grp.") (the ultimate parent company of Zurich) reported one of "the best results in its history",[1] with its Property & Casualty sector, reporting skyrocketing profit in part to the "***improved net impact from COVID-19***".[2]  As Zurich put it, its financial success was "driven by commercial insurance across all regions, with the level of price increases well above claims cost inflation.[3]  Simply put, Zurich jacked up its premiums while denying claims just like Texas Clothing's.

9.      Given Zurich's breach of its contractual promises of coverage while reaping a windfall from Coronavirus and COVID-19, Texas Clothing now turns to this Court for relief, seeking a declaratory judgment as to the scope and breadth of its rights under its high-end policy and damages for breach of contract.  In the wake of the devastation to its insured properties caused by Coronavirus and COVID-19, Texas Clothing should be allowed to rely on its insurance policy, and Zurich should be made to account.

## II.    PARTIES

10.     Texas Clothing is incorporated in the State of Delaware with its principal place of business at 1507 LBJ Freeway, Suite 100, Farmers Branch, Texas.  Texas Clothing is a citizen of Delaware and Texas.

11.     Texas Clothing is informed and believes, and based thereon alleges, that Defendant Zurich is a New York corporation with its principal place of business in the State of Illinois.  Zurich may be

---

[1] *Zurich delivers one of the best results in its history; expects to meet or exceed all 2022 targets*, ZURICH (Feb. 10, 2022), https://www.zurich.com/media/news-releases/2022/2022-0210-01 (last visited Feb. 10, 2022).
[2] *Id.* (emphasis added).
[3] *Id.*

served through its registered agent at Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

### III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

13.    This Court has general personal jurisdiction over Zurich pursuant to Fed. R. Civ. P. § 4(k)(1)(A) and Tex. Civ. Prac. & Rem. Code Ann. § 17.042 because Zurich carries on a continuous and systematic part of its general business within the State of Texas, including but not limited to marketing, selling, and issuing insurance policies to Texas businesses and insuring property in Texas.

14.    This Court also has specific personal jurisdiction over Zurich pursuant to Fed. R. Civ. P. §4(k)(A) and Tex. Civ. Prac. & Rem. Code Ann. § 17.042 because Zurich contracted with a Texas resident to insure property and/or risk located within the State of Texas at the time of contracting and out of which this action arose, and Texas Clothing performed portions of the contract (that is, the Zurich-issued all-risk insurance policy) in Texas.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Zurich conducts business in Texas and Texas Clothing resides in Farmers Branch, Texas.

### IV.    FACTUAL BACKGROUND

#### A.    Randa, Texas Clothing, and Haggar

16.    Randa fashion group, a global powerhouse founded in 1910 with over 100 years of expertise, is one of the world's leading fashion clothing and lifestyle accessories groups, operating a portfolio of over 40 owned and licensed brands across all channels of distribution. Randa produces a wide range of products including belts and furnishings; wallets and seasonal accessories; neckwear and jewelry; men's and women's apparel; and most recently Randa launched a PPE program providing stylish face masks. Randa is the owner of the HAGGAR® and TRIBAL® apparel brands, and is also a licensee for many third party household brands. Randa distributes its products globally through more than 20,000 stores and, through its various subsidiaries and affiliates, employs over 4,000 associates at 25 offices located in nine countries.

17.    Texas Clothing is owned by the Randa group and through its subsidiary, Haggar Corp. (a Nevada Corporation), wholly owns Haggar Clothing Co. ("Haggar Co.") (a Nevada Corporation).   In 2019, Randa acquired 100% ownership of Texas Clothing and its subsidiaries. Since its inception in 1926, Haggar Co. has grown from a manufacturer of men's fine dress pants and slacks into one of the most recognized apparel brands in the market.   Haggar Co. was founded by Joseph Marion Haggar Sr., a Lebanese immigrant, in a one-room office in Dallas, Texas and by 1970 became the number one pants brand in America.   Haggar Co. also owns the intellectual property for the Haggar Brand.

18.    Texas Clothing, through Haggar Co., also owns Montreal-based Tribal Sportswear, founded in 1971, which brand is the largest supplier of women's sportswear to the specialty boutique market in North America.

19.    Texas Clothing's business, at the time of the emergence of Coronavirus and COVID-19, earned revenue through the continued operation of (1) Haggar branded stores throughout twenty-nine states, including thirteen stores in Texas (the "Retail Business"); and (2) an international wholesale business providing fashion apparel and accessories to be sold in its customers' stores throughout the U.S. and the world, including many well-known names such as Boscov's, Costco, Belk, JCPenney, Kohl's, Men's Wearhouse, Nordstrom/Nordstrom Rack, Sam's Club,   and many more (the "Wholesale Business").

20.    At the outset of the Coronavirus and COVID-19, Texas Clothing's Retail Business earned revenues from Haggar Co.'s operation of 74 Haggar branded Stores, through its wholly-owned subsidiary, Haggar Direct, Inc., in the following twenty-nine states: Texas, Alabama, Arizona, California, Connecticut, Colorado, Delaware, Florida, Georgia, Louisiana, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, and Virginia.   Due to the twin blows of Coronavirus/COVID and Zurich's refusal to provide the business interruption and other coverage it owes Texas Clothing under the Policy, Texas Clothing was forced to close the lion's share of its Haggar Stores and today operates only 16 Stores in 9 states.

21.    The Haggar Stores are located within one (1) mile of many businesses that attract

customers to the Haggar Stores (defined as **Attraction Properties** in the Policy).  By way of example, Texas Clothing's **Attraction Properties** to the following Haggar Stores, prior to the emergence of Coronavirus and COVID-19, include but are not limited to:

- **Texas:**

    o <u>Ft. Worth</u>: The store is within one mile of Texas Motor Speedway host of NASCAR racing events, the Golf Club at Champions Circle, as well as various other businesses including museums and theaters.
    o <u>San Marcos</u>: The store is located in the Tanger Outlet mall and within a mile of multiple churches, restaurants, hotels, and auto dealerships.
    o <u>Texas City</u>: The store is located in the Tanger Outlets Houston mall and within a mile of the luxury apartment complex Catalon at Lago Mar and hotels.
    o <u>Terrell</u>: The store, now permanently closed, was located in The Shops at Terrell, a Tanger Outlet mall, and within a mile of hotels and restaurants.

- **Alabama:**

    o <u>Foley:</u> The store, now permanently closed, was located in a Tanger Outlet mall within one mile of Foley High School, Cracker Barrel, and many other restaurants, hotels and grocery stores.

- **Delaware:**

    o <u>Rehoboth Beach:</u> The store is located in a Tanger Outlet mall and is within one mile of various churches, restaurants, hotels, and grocery stores.

- **Florida**

    o <u>Destin:</u> The store, now permanently closed, was located in a Silver Sands Premium Outlet mall and within one mile of many businesses such as a black-light mini-golf/arcade, restaurants, a grocery store, and hotels.
    o <u>Ellenton:</u>  The store is located in Ellenton Premium Outlets mall and within a mile of restaurants, hotels, and an ice rink and Sports center.
    o <u>Estero</u>: The store is located in Miromar Outlets mall and within a mile of a golf course, restaurants, a grocery store and banking.
    o <u>Daytona:</u> The store, now permanently closed, was located in The Tanger Outlets Daytona Beach mall and within a mile of restaurants, electric vehicle charging stations, luxury apartment complexes, Madison Pointe and Tamoka Pointe, a Sam's Club and office parks.

- **Georgia:**

    o <u>Commerce</u>: The store, now permanently closed, was located in the Tanger Outlets mall and within a mile of hotels, restaurants and a Home Depot.

- o <u>Locust Grove</u>: The store, now permanently closed, was located in the Tanger Outlets mall and within a mile of the Georgia Department of Driver Services, restaurants, and hotels.
- o <u>Pooler</u>: The store is located in the Tanger Outlets Savannah mall and is within a mile of restaurants, a grocery store, a movie theater, and hotels.

- **<u>Kansas:</u>**

  - o <u>Kansas City</u>: The store, now permanently closed, was located in the Legends Outlet mall and within a mile of restaurants, hotels, Howl in One Mini Golf, and Great Wolf Lodge Water Park.

- **<u>Louisiana:</u>**

  - o <u>Bossier</u>: The store, now permanently closed, was located in the Louisiana Boardwalk Outlets mall and within a mile of Margaritaville Resort Casino, hotels and restaurants.

- **<u>Maryland:</u>**

  - o <u>Hagerstown:</u>  The store is located in the Hagerstown Premium Outlets mall and within a mile of restaurants.

- **<u>Michigan:</u>**

  - o <u>Birch Run</u>: The store is located in the Birch Run Premium Outlets mall and within a mile of hotels and restaurants.

- **<u>Missouri:</u>**

  - o <u>Branson</u>: The store, now permanently closed, was within one mile of a tourist area which includes an aquarium, a go-kart track and amusement park (The Track Family Fun Parks), restaurants, hotels, mini golf course and Splash Country Indoor & Outdoor Waterpark.

- **<u>Nevada:</u>**

  - o <u>Las Vegas:</u> The store, now permanently closed, was located in Las Vegas South Premium Outlets mall and within a mile of hotels, restaurants, and the Tahiti Village Resort.

- **<u>North Carolina:</u>**

  - o <u>Smithfield:</u> The store, now permanently closed, was located in the Carolina Premium Outlets mall and was within a mile of hotels and restaurants.

- **Ohio:**

  - <u>Jeffersonville:</u> The store is located in the Destinations Outlet mall and is within a mile of hotels and restaurants.

- **Pennsylvania:**

  - <u>Grove City:</u> The store is located in the Grove City Premium Outlets mall and within a mile of hotels and restaurants.
  - <u>Washington:</u> The store is located in the Tanger Outlets Pittsburgh mall and within a mile of hotels and restaurants.
  - <u>Lancaster:</u> The store is located in the Tanger Outlets Lancaster mall and within a mile of Biblical Tabernacle Experience museum, Dutch Wonderland amusement park, hotels and restaurants.

- **South Carolina:**

  - <u>Myrtle Beach:</u> The store is located in the Tanger Outlets Myrtle Beach Highway 501 mall and within a mile of the Wheels of Yesteryear auto museum.
  - <u>Bluffton:</u> The store, now permanently closed, was located in the Tanger Outlets Hilton Head mall and within a mile of Hilton Head National RV Resort, Hilton Head National Golf Club, and Old South Golf Links.
  - <u>N. Myrtle:</u> The store, now permanently closed, was located in the Tanger Outlets Myrtle Beach Highway 17 mall and within a mile of restaurants.
  - <u>N. Charleston:</u> The store is located in the Tanger Outlets mall and within a mile of North Charleston Fire Museum and Walmart Supercenter.

- **Tennessee:**

  - <u>Sevierville:</u> The store is located in the Tanger Outlets Sevierville mall and within a mile of Ripley's Old MacDonalds' Farm Mini Golf, Adventure Park Ziplines, Dave & Buster's, Five Oaks Riding Stables and NASCAR SpeedPark Smoky Mountains.

- **Virginia:**

  - <u>Williamsburg:</u>   The store, now permanently closed, was located in the Williamsburg Premium Outlets mall and within a mile of AMF Williamsburg Lanes, TGI Friday's, Astronomical Pancake House, Alewerks Brewing Company and Captain George's Seafood.

22.    The majority of Texas Clothing's revenues are earned through the operation of the Wholesale Business.  The Wholesale Business consists of the production and sale of a wide variety of fashion apparel and accessories to a vast number of businesses across the United States and internationally. Texas Clothing, together with and through its subsidiaries, provides apparel and accessory products to a

myriad of well-known companies both in the U.S. and globally. These customers of the Wholesale Business include but are not limited to: Kohl's, J.C. Penney, Amazon, Macy's, Bloomingdale's, TJX (TJ-Maxx, Marshalls, etc.), Belk, Target, Burlington, Men's Wearhouse, Nordstrom/Nordstrom Rack, Sam's Club, Boscov's, and Costco, among others (the "Wholesale Customers). Texas Clothing's business depends on these Wholesale Customers purchasing various of its apparel and accessory products for sale at their stores.

23.     Accordingly, Texas Clothing's Wholesale Business depends on the continued operation of the Wholesale Customers' stores throughout the U.S. and internationally (the "Wholesale Stores"). A majority of the products provided to the Wholesale Customers and their stores are processed in Texas Clothing's distribution center located in Fort Worth, Texas (an Insured **Location** under the Policy).

24.     As of January 2020, Texas Clothing and its subsidiaries employed approximately 597 individuals. Texas Clothing groups its employees into four categories: (1) customer service center employees working at the distribution center; (2) Haggar Retail employees at various Haggar Stores throughout the US; (3) Retail Merchandising Associates ("RMAs") – responsible for in-store merchandising of Texas Clothing products at the Wholesale Stores; and (4) Texas Clothing employees working in the corporate headquarters located in Farmer's Branch, Texas.

25.     As a part of its prudent business practices and in recognition of its responsibilities to its employees and customers, Texas Clothing maintains insurance coverage.

26.     Texas Clothing specifically maintains "all risk" commercial property coverage with Zurich, covering not only more commonly occurring risks like fire, but also entirely unanticipated and novel risks that may arise. The pertinent Zurich Policy was effective from November 1, 2019 to November 1, 2020 (the "Policy", **Ex. 1**).

27.     As described below, the Policy provides coverage for all "*loss of* or damage to" Texas Clothing's property unless specifically excluded (emphasis added).

**B.     Coronavirus and COVID-19**

28.     COVID-19 is a severe infectious disease caused by Coronavirus. Coronavirus causes

serious systemic illness and death.[4]  Coronavirus is primarily spread through airborne transmission, and cannot be effectively removed from the air or even entirely from many surfaces by means of routine surface cleaning.

29.     The existence and presence of Coronavirus and COVID-19 are not completely reflected in reported cases or individuals' positive test results, as only a portion of the population has been tested. For example, in June 2020, the Centers for Disease Control and Prevention ("CDC") estimated that the number of people in the U.S. who had been infected with COVID-19 was ten times higher than the number of reported cases.[5]  Additionally, at least 40% of people infected with COVID-19 are asymptomatic.[6] COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to other people, given that they release infectious droplets and aerosols into the air and onto surfaces without having experienced symptoms and without realizing that they are contagious or infected.[7]

30.     Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry high levels of "viral load" during a period when they have no symptoms and therefore are unaware that they are infectious.[8]  The National

---

[4] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT'L INST. HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited Mar. 9, 2022), **Ex. 2**; Nathan Jaffay, *COVID proteins that trigger strokes and heart attacks identified by Israeli team*, TIMES ISR. (Nov. 3, 2021), https://www.timesofisrael.com/covid-pieces-that-trigger-strokes-and-heart-attacks-identified-by-israeli-team/?utm_source=dlvr.it&utm_medium=twitter (last visited Mar. 9, 2022), **Ex. 3**.

[5] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Mar. 9, 2022), **Ex. 4**.

[6] Ellen Cranley, *40% of people infected with Covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited Mar. 9, 2022), **Ex. 5**.

[7] *See Coronavirus disease 2019 (COVID-19) Situation Report – 73*, WHO (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 9, 2022), **Ex. 6**; Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3 (Feb. 1, 2021), https://www.atsjournals.org/doi/10.1164/rccm.202006-2136LE (last visited Mar. 9, 2022), **Ex. 7**.

[8] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672-75, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Mar. 9, 2022), **Ex. 8**; Lirong Zou et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. MED. 382, 1177-79 (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited Mar. 9, 2022), **Ex. 9**.

Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."[9]

31.    As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the source of new infections, also known as community transmission or community spread.

32.    COVID-19 is highly contagious, uniquely resilient, and potentially deadly.  The degree to which an infectious disease is contagious is measured by $R_0$, a term that defines the average number of other people who are likely to become infected by one person with that disease.  The $R_0$ is a measure of the transmissibility of a pathogen and is determined by estimating the susceptibility of individuals in the population to disease, the transmissibility of the pathogen and importantly, the likelihood and duration of contact between individuals in a population, a parameter that is directly determined by the physical properties of the environment in which contact occurs.[10]  Studies have concluded that one person with COVID-19 could infect as many as 5.7 others ($R_0 \approx 5.7$), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R_0 \approx 1.3$).[11]

33.    Coronavirus can remain infectious for "much longer time periods than generally considered possible."[12]

34.    The World Health Organization ("WHO") stated that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks…People can catch COVID-19 if they breathe in these droplets

---

[9] Seyed M. Moghadas et al., *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited Mar. 9, 2022), **Ex. 10**.

[10] Anthony R. Ives & Claudio Bozzuto, *Estimating and explaining the spread of COVID-19 at the county level in the USA*, 4 COMMC'NS BIOLOGY 60 (Jan. 5, 2021), https://www.nature.com/articles/s42003-020-01609-6 (last visited Mar. 9, 2022), **Ex. 11**.

[11] M. Cevik et al., *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL MICROBIOLOGY & INFECTION 7, 842-47 (July 1, 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Mar. 9, 2022), **Ex. 12**.

[12] Shane Riddell et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited Mar. 9, 2022), **Ex. 13**.

from a person infected with the virus…These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[13]

35.    People infected with Coronavirus spread the virus not only from small droplets but also from aerosols expelled from their nose and mouth when they cough, sneeze, or speak.  People become infected with Coronavirus and resultant COVID-19 disease if they breathe in these droplets or aerosols expelled by an infected person.  Droplets and aerosols can be expelled in close proximity (one-to-two meters) or can be carried on air currents tens of meters.[14]

**C.    Coronavirus and COVID-19 Cause Physical Loss of or Damage to Property**

36.    The omnipresence of Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne/aerosolized, and fomite transmission (i.e., transmission from surfaces and objects).[15]  These transmission methods demonstrate that Coronavirus and COVID-19 cause physical loss of or damage to property.

**1.    Respiratory Droplet/Airborne Transmission**

37.    The presence of Coronavirus in the air physically alters and transforms the content of the room air as shown in the following illustrations which depict normal room air at the molecular level in comparison to room air infested with aerosolized Coronavirus at increasing concentration.  Normal room air and room air infested with aerosolized Coronavirus is also compared to room air containing ammonia to depict the similarities in the physical alteration caused by aerosolized Coronavirus and ammonia and ammonia is a substance that courts have held causes physical loss of or damage to property by impairing the functional use of the property.  As depicted, aerosolized Coronavirus causes the same physical loss of

---

[13] *Q&A on coronaviruses (COVID-19)*, WHO (updated Apr. 17, 2020), https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Mar. 9, 2022), **Ex. 14**.

[14] Lidia Morawska & Donald K. Milton, *It Is Time to Address Airborne Transmission of Coronavirus Disease 2019 (COVID-19)*, 71 CLINICAL INFECTIOUS DISEASES 9, 2311-13 (Dec. 3, 2020), https://pubmed.ncbi.nlm.nih.gov/32628269/ (last visited Mar. 9, 2022), **Ex. 15**.

[15] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 9, 2022), **Ex. 16**.

or damage to property caused by ammonia, smoke, soot, radon gas, asbestos and other hazardous substances.

**Composition of Room Air – Normal vs. Ammonia vs. SARS-CoV-2 Over Time**







38.     Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[16]   Respiratory transmission of Coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission.   Though convenient, this binary division is an oversimplification that underscores transmission risk.[17]   Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with virions predominating in the smallest particles.[18] Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[19]   An M.I.T. researcher has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[20]   A comprehensive review of viral, host, and environmental factors that affect Coronavirus transmission reported on the "abundant evidence" that proximity is a significant factor in measuring Coronavirus transmission risks.[21]

39.     Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain infectious when suspended in the air over long distances and time.[22]   These tiny particles can remain suspended "for

---

[16] *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 9, 2022), **Ex. 16**.

[17] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 9, 2022), **Ex. 17**.

[18] *Id.*

[19] *Id.*

[20] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Mar. 9, 2022), **Ex. 18**.

[21] Eric A. Meyerowitz et al., *Transmission of SARS-CoV-2: A Review of Viral, Host, and Environmental Factors*, ANNALS INTERNAL MED. (Jan. 2021), https://www.acpjournals.org/doi/10.7326/M20-5008 (last visited Mar. 9, 2022), **Ex. 19**.

[22] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38 (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Mar. 9, 2022), **Ex. 18**; *see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME (Aug. 25, 2020), https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Mar. 9, 2022), **Ex. 20**; Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Mar. 9, 2022), **Ex. 21**; Wenzhao Chen et al., *Short-range airborne route*

indefinite periods unless removed by air currents or dilution ventilation."[23]  As a result, the risk of disease transmission increases substantially in enclosed environments, compared to outdoor settings.[24]

40.    The airborne transmission of Coronavirus within buildings is depicted in the following illustrations:



[25]

---

*dominates exposure of respiratory infection during close contact*, 176 BLDG. & ENV'T (June 2020), https://www.sciencedirect.com/science/article/pii/S0360132320302183 (last visited Mar. 9, 2022), **Ex. 22**.

[23] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 9, 2022), **Ex. 17**.

[24] Muge Cevik et al., *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (Sept. 23, 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Mar. 9, 2022), **Ex. 23**.

[25] Luis Almodóvar, *Breathing, speaking and shouting* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, EL PAÍS (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited Mar. 9, 2022), **Ex. 24**.

---





---

[26] *How cough and sneeze droplets travel* (illustration), *in* Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (updated Sept. 21, 2020), https://www.usatoday.com/in-depth/news/2020/04/03/coronavirus-protection-how-masks-might-stop-spread-through-coughs/5086553002/ (last visited Mar. 9, 2022), **Ex. 21**.

[27] *Coronavirus aerosols and droplets* (illustration), *in* Mariano Zafra & Javier Salas, *A room, a bar and a classroom: how the coronavirus is spread through the air*, El País (Oct. 29, 2020), https://english.elpais.com/society/2020-10-28/a-room-a-bar-



28



29

---

and-a-class-how-the-coronavirus-is-spread-through-the-air.html?fbclid=IwAR1jmVExKaRBcT9-lUHc9RV-xBO-XIShPlFtZsdyn1ltCeoNEXwtV_YP4q0 (last visited Mar. 9, 2022), **Ex. 24**.

[28] *Major modes of transmission of respiratory viruses during short-range and long-range transmission* (illustration), *in* Nancy H.L. Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 528-45 (Mar. 22, 2021), https://www.nature.com/articles/s41579-021-00535-6 (last visited Mar. 9, 2022), **Ex. 25**.

[29] *The Cycle of Property Damage by Persons with COVID-19 in Air and On Surfaces* (illustration), *in* Treasure Island, LLC's Motion to Amend Complaint, Exhibit K at 11, Treasure Island, LLC v. Affiliated FM Ins. Co., No. 2:20-cv-00965-JCM-EJY (Mar. 8, 2021) (No. 85-2), **Ex. 26**.



WHO reported exposure mechanisms for COVID-19 SARS-CoV-2 droplets (dark
blue color). Light blue color: airborne mechanism that is known from SARS-CoV-1
and other flu, currently there is no reported evidence specifically for SARS-CoV-2
(Credit: Francesco Franchimon – image from the REVHA COVID-19 Guidance
Document(2))
30

---

30 Francesco Franchimon, *image from REVHA COVID-19 Guidance Document(2)* (illustration), *in* Peter Rumsey et al.,
*COVID-19 and Office Building HVAC Responses*, PEI BLOG (updated July 8, 2020),
https://www.pointenergyinnovations.com/covid-19-and-office-building-hvac-responses/ (last visited Mar. 9, 2022), **Ex. 27**.





---

[31] *Microscopic View of 3D Spherical Viruses – stock photo* (illustration), *in The COVID-19 virus can spread through the air – here's what it'll take to detect the airborne particles*, CONVERSATION (Aug. 14, 2020), https://theconversation.com/the-covid-19-virus-can-spread-through-the-air-heres-what-itll-take-to-detect-the-airborne-particles-140149 (last visited Mar. 9, 2022), **Ex. 28**.



41.    Available videos demonstrate Coronavirus "aerosol clouds" lingering indoors in a supermarket, transmitting COVID-19 and rendering the business premises unsafe, uninhabitable, unfit for its intended use or causing it to lose, in whole or in part, its functional use.[33]

42.    The WHO and the scientific community have studied the spread of Coronavirus through aerosols in indoor settings via air circulation systems.  For example, on April 5, 2021, the CDC concluded that:

- "[t]he principal mode by which people are infected with [Coronavirus] … is through exposure to respiratory droplets carrying infectious virus"; and

- "when a person with suspected or confirmed COVID-19 has been indoors, virus can remain suspended in the air for minutes to hours."[34]

43.    Investigation of over 7,000 COVID-19 cases found that all outbreaks involving three or more people occurred indoors.[35]  Airborne Coronavirus viral RNA has also been detected inside hospitals at distances over 50 meters from COVID-19 patients' rooms.[36]

---

[32] Mikko Auvinen & Antti Hellsten (animation), Marie Szaniszlo, *Simulation shows how the coronavirus can spread in supermarkets*, Boston Herald (updated Apr. 11, 2020), https://www.bostonherald.com/2020/04/09/simulation-shows-how-the-coronavirus-can-spread-in-supermarkets/ (last visited Mar. 9, 2022) **Ex. 29**.

[33] *See e.g.*, David Mercer, *Coronavirus lingers in air longer than previously thought, scientists warn*, SKY NEWS (Apr. 10, 2020), https://news.sky.com/story/coronavirus-3d-model-reveals-how-covid-19-can-spread-in-supermarket-11971373 (last visited Mar. 9, 2022) **Ex. 30**.

[34] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Mar. 9, 2022), **Ex. 31**.

[35] Hua Qian et al., *Indoor transmission of SARS-CoV-2*, 31 INDOOR AIR 3, 639-45 (May 2021), https://pubmed.ncbi.nlm.nih.gov/33131151/ (last visited Mar. 9, 2022), **Ex. 32**.

[36] Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals*, 582 NATURE 7813, 557-60 (June 2020), https://pubmed.ncbi.nlm.nih.gov/32340022/ (last visited Mar. 9, 2022), **Ex. 33**.

44.    Moreover, the CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of Coronavirus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[37]  Moreover, one study detected Coronavirus inside HVAC systems transmitted over 180 feet from its source.[38]

45.    A systematic review of airborne transmission of Coronavirus corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration and reduce Coronavirus' spread.[39]

46.    Additionally, on May 7, 2021, the CDC issued a scientific warning of the risks of indoor airborne transmission of Coronavirus from aerosols at distances greater than six feet from the source, stating that "transmission of SARS-CoV-2 [i.e., Coronavirus] from inhalation of virus in the air farther than six feet from an infectious source can occur" and that:

> With increasing distance from the source, the role of inhalation likewise increases. Although infections through inhalation at distances greater than six feet from an infectious source are less likely than at closer distances, the phenomenon has been repeatedly documented under certain preventable circumstances. These transmission events have involved the presence of an infectious person exhaling virus indoors for an extended time (more than 15 minutes and in some cases hours) leading to virus concentrations in the air space sufficient to transmit infections to people more than 6 feet away, and in some cases to people who have passed through that space soon after the infectious person left. Per published reports, factors that increase the risk of SARS-CoV-2 infection under these circumstances include:
>
> - **Enclosed spaces with inadequate ventilation or air handling** within which the concentration of exhaled respiratory fluids, especially very fine droplets and aerosol particles, can build-up in the air space.
> - **Increased exhalation** of respiratory fluids if the infectious person is

---

[37] Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Mar. 9, 2022), **Ex. 34**; *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46, e415 (Nov. 30, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e415 (last visited Mar. 9, 2022), **Ex. 35**.

[38] Karolina Nissen et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI. REPS. 10, 19589 (Nov. 11, 2020), https://www.nature.com/articles/s41598-020-76442-2 (last visited Mar. 9, 2022), **Ex. 36**.

[39] Zahra Noorimotlagh et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited Mar. 9, 2022), **Ex. 37**.

engaged in physical exertion or raises their voice (e.g., exercising, shouting, singing).

- **Prolonged exposure** to these conditions, typically more than 15 minutes.[40]

47.    The CDC has recommended "ventilation interventions" to help reduce exposure to airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[41]    These and other remedial measures must be implemented, at high cost and extra expense, to mitigate loss and reduce the amount of Coronavirus present in the space and to make property marginally safer for its intended use.  These extreme measures demonstrate that Coronavirus and COVID-19 cause direct physical loss of or damage to interior spaces. Even then, those interventions cannot be guaranteed to eliminate the aerosolized Coronavirus in an indoor space.  Nor do they eliminate it immediately.

48.    The inability to guarantee complete or immediate elimination of aerosolized Coronavirus in indoor spaces can be observed acutely by comparing the infection rates of "essential workers" with that of the general public.  Essential workers are defined by the CDC to be those who conduct "operations and services in industries that are essential to ensure the continuity of critical functions in the United States."[42]

49.    After the first wave of mass business closures in March and April of 2020, employees of so-called "essential businesses" that were eventually allowed to re-open or operate at reduced capacities (i.e., essential workers) were faced with elevated rates of infection when compared to the general public, demonstrating the presence of Coronavirus in their workplaces, rendering the same unfit and unsafe for normal use (e.g., for people to be present therein).[43]  For example:

---

[40] *Scientific Brief: SARS-CoV-2 Transmission*, CDC (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fscience%2Fscience-briefs%2Fscientific-brief-sars-cov-2.html (last visited Mar. 9, 2022), **Ex. 38**.

[41] *Ventilation in Buildings*, CDC (updated June 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited Mar. 9, 2022), **Ex. 39**.

[42] *See Interim List of Categories of Essential Workers Mapped to Standardized Industry Codes and Titles*, CDC (updated Mar. 29, 2021), https://www.cdc.gov/vaccines/covid-19/categories-essential-workers.html (last visited Mar. 9, 2022).

[43] Joanna Gaitens et al, *COVID-19 and Essential Workers: A Narrative Review of Health Outcomes and Moral Injury*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 4, 1446 (Feb. 4, 2021), https://www.mdpi.com/1660-4601/18/4/1446 (last visited Mar. 9, 2022), **Ex. 40**.

- One study found that 20% of essential grocery store workers tested positive for COVID-19, a much higher rate of infections than others in their surrounding communities[44] and that those grocery store workers with interactions with the public tested positive for COVID-19 at a rate five times greater than the general population.[45]

- Essential workers (e.g., liquor store employees) accounted for 87% of excess deaths in California[46] and over 60% in New York City.[47]

- Nursing home residents and employees accounted for at least 35% of all COVID-19 deaths in the United States.[48]

50.    Similar findings have been reported across various sectors of essential workers, including elevated rates of infection for emergency services personnel (e.g., firefighters, police), prison correctional officers, and transportation and factory workers, among others.[49]  These findings disprove arguments that Coronavirus does not affect the safety, usability or the functional use of property because the government allowed businesses it determined were "essential" to remain open.

### 2.    Fomite (i.e., Surface and Object) Transmission

51.    COVID-19 may also be transmitted to people from physical objects, materials, or surfaces. "Fomites" are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[50]  Fomite transmission has been demonstrated as

---

[44] *Id.*

[45] Fan-Yun Lan et al., *Association between SARS-CoV-2 infection, exposure risk and mental health among a cohort of essential retail workers in the USA*, 78 OCCUPATIONAL ENV'T MED. 237-43 (Oct. 30, 2020), https://oem.bmj.com/content/oemed/78/4/237.full.pdf (last visited Mar. 9, 2022), **Ex. 41**.

[46] Yea-Hung Chen et al., *Excess mortality associated with the COVID-19 pandemic among Californians 18-65 years of age, by occupational sector and occupation: March through November 2020*, 16 PLOS ONE 6, e0252454 (June 4, 2021), https://pubmed.ncbi.nlm.nih.gov/34086762/ (last visited Mar. 9, 2022), **Ex. 42**.

[47] *The plight of essential workers during the COVID-19 pandemic*, 395 LANCET 1587 (May 23, 2020), https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2931200-9 (last visited Mar. 9, 2022), **Ex. 43**.

[48] Artis Curiskis et al., *Federal COVID Data 101: Working with CMS Nursing Home Data*, ATLANTIC (Mar. 4, 2021), https://covidtracking.com/analysis-updates/federal-covid-data-101-working-with-cms-nursing-home-data (last visited Mar. 9, 2022), **Ex. 44**.

[49] *Id.*

[50] *Fomite*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/fomite (last visited Mar. 9, 2022).

highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[51]

52.     In addition, while fomite transmission may not be the primary route of transmission for COVID-19, fomite transmission is significant and in October 2020 was estimated to be responsible for up to 25% of all deaths due to COVID-19 since lockdowns were imposed.[52]

53.     The WHO has described fomite transmission as follows:

Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces). **<u>Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days</u>**, depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated.  Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . . .[53] (Emphasis added).

54.     In addition to studies cited by the WHO,[54] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

- A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.[55]

- A National Institutes of Health study published in the New England Journal of Medicine finding that Coronavirus survives up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel, and suggesting that people may acquire the virus through the air and after touching contaminated objects.[56]

---

[51] P. Rusin et al., *Comparative surface-to-hand and fingertip-to-mouth transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. APPLIED MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002), https://pubmed.ncbi.nlm.nih.gov/12234341/ (last visited Mar. 9, 2022), **Ex. 45**.

[52] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 23, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Mar. 9, 2022), **Ex. 46**.

[53] *See, e.g.*, *Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 9, 2022), **Ex. 16**.

[54] *Id.*

[55] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Mar. 9, 2022), **Ex. 47**.

[56] *New coronavirus stable for hours on surfaces*, NAT'L INST. HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited Mar. 9, 2022), **Ex. 48**.

- An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (e.g., shaking a contaminated textile such as clothing merchandise).[57]  According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[58]  Generally, frequently touched surfaces can become highly transmissive fomites.[59]

- A CDC research letter reporting that Coronavirus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[60]

- A Journal of Hospital Infection article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to nine days.[61]

55.    Importantly, Coronavirus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic and asymptomatic individuals.[62]  Fomites are known to transform the surface of property into a potentially deadly Coronavirus transmission device.

56.    As noted above, Coronavirus can remain infectious for a considerable length of time.  For example, in the Journal of Virology, researchers demonstrated that Coronavirus can survive up to twenty-eight days at room temperature (68ºF) on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[63]  A CDC report from March 27, 2020, stated that Coronavirus was identified on surfaces of the cabins on the Diamond Princess cruise ship seventeen days after the cabins were vacated but before they

---

[57] Stephanie A. Boone & Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED & ENV'T MICROBIOLOGY 6, 1687-96 (Mar. 2007), https://aem.asm.org/content/73/6/1687 (last visited Mar. 9, 2022), **Ex. 49**.

[58] *Id.*

[59] *Id.*

[60] Boris Pastorino et al., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Mar. 9, 2022), **Ex. 50**.

[61] G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSP. INFECTION 104, 246-51 (Feb. 6, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited Mar. 9, 2022), **Ex. 51**.

[62] Minghui Yang et al., *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://www.atsjournals.org/doi/pdf/10.1164/rccm.202006-2136LE (last visited Mar. 9, 2022), **Ex. 7**.

[63] *Id.*

were disinfected.[64]

57.    Numerous other scientific studies and articles have identified the persistence of Coronavirus on doorknobs, toilets, faucets, and other high-touch points, as well as on commonly overlooked surfaces such as floors.[65]

58.    While the detection of viral RNA on surfaces or in the air does not necessarily mean that Coronavirus is currently present and infectious, it demonstrates that Coronavirus was in fact present. Studies have demonstrated the transmission of laboratory-confirmed Coronavirus infection via surfaces.[66]

**3.    These Modes of Transmission Cause Physical Loss of or Damage to Property**

59.    The presence of Coronavirus in and on property, including in the indoor air, on surfaces, and on objects, causes physical loss of or damage to property by physically changing and physically altering property and otherwise making it incapable of being used for its intended purpose – just as if asbestos, ammonia, radon gas, cat urine, fumes, sulfuric gases emitted from Chinese drywall, carbon monoxide, mold, or salmonella were in the air or on surfaces of the premises.

60.    Among other things, the presence of Coronavirus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another.  The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "*creating* fomites (contaminated surfaces)."[67] "Creating" involves making or bringing into existence something new[68] – such as something that is in an

---

[64] Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-52 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Mar. 9, 2022), Ex. 52.

[65] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 9, 2022), **Ex. 53**.

[66] Nancy HL Leung, *Transmissibility and transmission of respiratory viruses*, NATURE REVS. MICROBIOLOGY 1-18 (Mar. 22, 2021), https://pubmed.ncbi.nlm.nih.gov/33753932/ (last visited Mar. 9, 2022), Ex. 25; G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. HOSP. INFECTIONS 3, 246-51 (Mar. 2020), https://pubmed.ncbi.nlm.nih.gov/32035997/ (last visited Mar. 9, 2022), **Ex. 51**.

[67] *See, e.g., Scientific Brief: Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 9, 2022), **Ex. 16** (emphasis added).

[68] *See, e.g., Create*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/create (last visited Mar. 9, 2022), **Ex. 54**.

altered state from what it was before Coronavirus was present on, in and around the property.

61.    Coronavirus adheres to surfaces and objects, physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use.  For example, Texas Clothing's properties (including the Haggar Stores) each boast countless fixtures, counters, point of sale areas, restroom taps, door handles, clothing, and many other surfaces on which Coronavirus can deposit, transforming the surfaces into fomites ripe for COVID-19 transmission.  Once Coronavirus is in, on, or near property, it is easily spread by the air, people, and objects, from one area to another, causing additional physical loss of or damage to property.

62.    Additionally, the presence of the dangerous and potentially fatal Coronavirus in and on property, including in indoor air, on surfaces, and on objects, renders the property unsafe, uninhabitable and unfit for its intended or causes it to lose, in whole or in part, of the functional use of that property.  Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable, uninhabitable, and unfit for normal use or cause the loss, in whole or in part, of their functional use.

63.    In addition to being found in air samples,[69] Coronavirus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[70]

**D.    Coronavirus Cannot be Removed or Eliminated by Routine Cleaning and its Continuous Reintroduction Into Business Premises Remaining Open to the Public Renders Cleaning and Disinfection of it Useless and Futile**

64.    Coronavirus cannot be removed by routine surface cleaning.

65.    In fact, the CDC released guidance stating that there is little evidence to suggest that routine

---

[69] Zhen-Dong Guo et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 9, 2022), **Ex. 53**.

[70] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited Mar. 9, 2022), **Ex. 55**.

use of disinfectants can prevent the transmission of Coronavirus from fomites in community settings.[71] The CDC concluded that according to a more quantitative microbial risk assessment study, "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[72]

66.     A number of studies have similarly demonstrated that Coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[73]  The measures that must be taken to attempt to remove and disinfect Coronavirus from property are significant and depend on the concentration of Coronavirus, myriad surface characteristics (e.g., type of surface, temperature, porosity) and extend far beyond ordinary or routine cleaning.

67.     The efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, surface porosity, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  No reported studies have investigated the efficacy of surface cleaning (with soap or detergent not containing a registered disinfectant) for reducing concentrations of Coronavirus on non-porous surfaces.[74]  However, in one study, detergent surfactants were not recommended as single agents, but rather in conjunction with other complex disinfectant solutions.[75]

68.     Additionally, unlike cleaning a visible substance such as dust, Coronavirus is invisible to the naked eye, making it challenging to accurately determine the efficacy of decontaminating agents and

---

[71] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Mar. 9, 2022), **Ex. 31**.

[72] *Id.* (citing A. K. Pitol & T. R. Julian, *Community transmission of SARS-CoV-2 by fomites: Risks and risk reduction strategies*, ENV'T SCI. & TECH. LETTERS (2020), **Ex. 56**).

[73] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited Mar. 9, 2022), **Ex. 55**.

[74] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Mar. 9, 2022), **Ex. 31**.

[75] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited Mar. 9, 2022), **Ex. 55**.

how "clean is clean" or if surface disinfection was even effective. Moreover, the toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[76]

69.    To be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" conditions in the midst of a widespread wave of pervasive Coronavirus spread, where treated surfaces or objects may not undergo even exposure or adequate contact time.[77] Indeed, studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[78]

70.    When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[79]

71.    With respect to textiles (e.g., clothing merchandise) – an exceedingly common item at all Texas Clothing properties – studies have demonstrated that virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[80] Coronavirus, which was dispersed onto and into the very fabric of Texas Clothing's merchandise, therefore caused physical loss of or damage to those commonly used textiles, transforming them into hazardous material.

72.    Many of the surfaces and materials discussed in the studies and articles cited above are used throughout Texas Clothing's properties (including the Haggar Stores) as part of their operations, including plastics, glass, metals, and cloth and fabrics. Similarly, these surfaces and materials are used in

---

[76] *Id.*

[77] *Id.*

[78] Joon Young Song et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited Mar. 9, 2022), **Ex. 57.**

[79] *Id.*

[80] Lucy Owen & Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE & ENV'T e9790, 1-35 (Aug. 25, 2020), https://peerj.com/articles/9790/ (last visited Mar. 9, 2022), **Ex. 58**.

virtually all gyms, health clubs, office buildings, stores, shopping centers, restaurants, movie theaters, and other businesses and amenities throughout the U.S. and the across the globe.

73.     Studies have demonstrated that even extraordinary cleaning measures do not remove Coronavirus from surfaces.  For example, a 2021 study by the largest hospital network in New York State demonstrated that even *after* trained hospital personnel used disinfection procedures in Coronavirus patient treatment areas, much of the virus *survived* in those areas – proving even intense, non-routine surface cleaning does not remove it from surfaces – let alone from the air.[81]

74.     Given the inadequacy of conventional cleaning procedures, and in response to the physical loss of or damage to property at the Texas Clothing properties caused by the presence of Coronavirus and COVID-19 on surfaces, disinfection and decontamination measures have included, but are not limited to, the use of harsh chemicals to perform deep disinfection, and the removal and disposal of porous materials like clothing, cloth and other fabrics.

75.     Texas Clothing also, as a result of or in connection with the physical loss of or damage to its property, has removed or decommissioned property within its properties and otherwise reconfigured and altered interior spaces to respond to and restore the physical loss of or damage caused by Coronavirus.

76.     None of the above-referenced surface cleaning measures, however, remove Coronavirus from the room air.  And, in fact, many actually exacerbate the damage to the room air.  Aerosolized Coronavirus particles and virions specifically cannot be eliminated by routine surface cleaning and routine cleaning methods have been shown to make the aerosolization situation worse, in some cases cleaning contaminated surfaces (i.e., floors) could reasonably result in re-aerosolization of Coronavirus.

77.     Cleaning Coronavirus from surfaces in an indoor space does not remove aerosolized Coronavirus particles from the indoor air any more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air.  In each case, people can inhale and become infected with Coronavirus or develop asbestos-related diseases.

---

[81] Zarina Brune et al., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last visited Mar. 9, 2022), **Ex. 59**.

78.     Moreover, given the ubiquity and pervasiveness of Coronavirus, no amount of cleaning or ventilation intervention or even the dissipation of Coronavirus with the passage of time, will prevent a person who is infected with Coronavirus and contagious from entering an indoor space and exhaling millions of additional Coronavirus droplets and infectious aerosols into the air, thereby further: (a) filling the room air and physically altering it with aerosolized and hazardous Coronavirus that can be inhaled; and (b) depositing infectious Coronavirus droplets on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

79.     Stated differently, the continuous reintroduction of Coronavirus by infectious persons into a publicly open indoor space renders cleaning, ventilation interventions and even dissipation over time futile.  None of these things, while they may mitigate the situation temporarily, eliminate the presence of Coronavirus.  As such, none of these things make indoor property safe, habitable or fit for its intended use, especially with respect to the time period before the emergence of widely available vaccinations for COVID-19 and widely effective and available treatments for COVID-19.

80.     The scientific facts and reality of Coronavirus in our world and in the State of Texas could not be clearer – the physical invasion by deadly Coronavirus particles that spread COVID-19 is not a single discharge event, such as a pipe bursting and spilling a toxic substance into a room that, once the valve is shut off, the substance can be cleaned and dissipated from the room.  To the contrary, due to its continuous reintroduction into businesses that remain open to the public, the physical invasion by deadly Coronavirus particles that spread deadly COVID-19 into such a business is a continuous discharge event that does not stop.  As such, even if cleaning and dissipation of a one-time Coronavirus invasion into the business were effective in removing the virus, Coronavirus' continuous reintroduction into the business leaves the business owner no opportunity to permanently remove the virus from the business by cleaning or dissipation so that the building could be made safe for its intended use.  It is akin to placing a pipe pumping fumes into a business premises with the valve stuck in the open position indefinitely – depriving the business owner of the opportunity to clean or dissipate the fumes

81.     Thus, Texas Clothing is not able to remove or eliminate Coronavirus from its property with routine cleaning.

82.     The only way to eliminate the presence of Coronavirus from property and prevent its continuous reintroduction is to close property to the public and bar the public from entering.

**E.     Coronavirus Was Present at Texas Clothing's Properties (including the Haggar Stores), their Attraction Properties, and Texas Clothing's Dependent Locations (including the Wholesale Stores)**

83.     More than 80 of Texas Clothing's employees in the United States (including 54 in Texas) have confirmed to Texas Clothing or its subsidiaries that they had been infected with Coronavirus and contracted COVID-19, and virtually all of Texas Clothing's employees who tested positive for COVID-19 did so during time periods when the Texas Clothing properties where they worked were open for business and they were present.

84.     Given the high percentage of asymptomatic cases of COVID-19, it is certain that the actual number of Texas Clothing employees who had contracted COVID-19 was substantially greater than the over 80 employees known to have contracted COVID-19.  It is indisputable that persons infected with COVID-19 exhale millions of Coronavirus virions into the indoor air of the buildings that they occupy. This is proof of the actual, certain presence of Coronavirus at Texas Clothing's properties (including the Haggar Stores).

85.     Additionally, given that Coronavirus is highly contagious, the global pervasive status of COVID-19, and the heavily trafficked common areas in and around Texas Clothing's properties, including its locations within Texas, it is statistically certain, or near-certain, that many other individuals at or in the vicinity of Texas Clothing's properties contracted and carried Coronavirus.

86.     Texas, like much of the nation, experienced dramatic COVID-19 outbreaks in mid-and late-March 2020.[82]  By April 18, 2020, there were 18,260 COVID-19 cases and 619 deaths from COVID-

---

[82] Christopher Adams, *TIMELINE: How coronavirus in Texas unfolded since first case one year ago*, KXAN (updated Mar. 10, 2021), https://www.kxan.com/news/coronavirus/365-days-of-covid-how-the-coronavirus-in-texas-unfolded-one-year-after-the-first-case/ (last visited Mar. 9, 2022); Elvia Limón, *Coronavirus in Texas: Here's how the COVID-19 pandemic has unfolded in Texas since March* TEXAS TRIBUNE (updated Dec. 18, 2020), https://www.texastribune.org/2020/07/31/coronavirus-timeline-texas/ (last visited Mar. 9, 2022).

19 across Texas.[83]

87.     Moreover, the high number of COVID-19 deaths indicates a significantly higher number of cases than those confirmed by COVID-19 tests.[84]

88.     The high prevalence of infectious COVID-19 cases makes it statistically certain or near-certain that Coronavirus droplets and aerosols were dispersed repeatedly into the air and on property in, on and around Texas Clothing's properties, rendering routine cleaning even less effective at removing Coronavirus from surfaces at those locations and completely ineffective at removing aerosolized Coronavirus particles and virions from the air inside those locations. And the continuous reintroduction of Coronavirus into Texas Clothing's properties made attempts to clean, disinfect or dissipate Coronavirus from those properties useless and futile.

89.     This was also the case at a myriad of business and tourist destinations throughout the states, including those within one mile of each Haggar Store that attract customers to the Haggar Stores (referred to as **Attraction Properties** in the Policy). These **Attraction Properties** include, among other things, metropolitan areas like Fort Worth, Myrtle Beach, and Las Vegas (which host Haggar Stores), tourist attractions, office buildings, stores, shopping centers, restaurants, movie theaters and the like, including but not limited to those **Attraction Properties** listed above. The same is true for the businesses and properties owned by Texas Clothing's customers, including the Wholesale Stores, located throughout the U.S. and internationally (Texas Clothing's "**Dependent Locations**").[85]

90.     Due to the high prevalence of infectious cases, Coronavirus was statistically certain or near

---

[83] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, CDC (updated Mar. 3, 2022), https://covid.cdc.gov/covid-data-tracker/#trends_totalcases (last visited Mar. 9, 2022); Elvia Limón, *Coronavirus in Texas: Here's how the COVID-19 pandemic has unfolded in Texas since March* Texas Tribune (updated Dec. 18, 2020), https://www.texastribune.org/2020/07/31/coronavirus-timeline-texas/ (last visited Mar. 9, 2022).

[84] Andrew T. Levin et al., *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications,* 35 EUR. J. EPIDEMIOLOGY 12, 1123-38 (Dec. 8, 2020), https://pubmed.ncbi.nlm.nih.gov/33289900/ (last visited Mar. 9, 2022), **Ex. 60**.

[85] Defined in the Policy as **Direct Dependent Time Element Locations** (defined as including: "Any **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured;" and "Any **Location** of any company under a royalty, licensing fee or commission agreement with the Insured.") and **Indirect Dependent Time Element Locations** ("Any **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**;" and "Any **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**.).

certain to be present at a myriad of **Attraction Properties** and Texas Clothing's **Dependent Locations** (including the Wholesale Stores) throughout Texas and the U.S., in locations where the Haggar Stores operate and where the **Attraction Properties** and Texas Clothing's **Dependent Locations** are located.

91.     The CDC keeps track of known infections by county, and each of the U.S.'s over 3,142 county and county-equivalents has reported COVID-19 infections.

92.     The presence of Coronavirus at Texas Clothing's properties, as well as many nearby **Attraction Properties**, and at Texas Clothing's **Dependent Locations**, was certain or virtually certain. This can be confirmed with certainty or near-certainty by statistical modeling based on the known incidences of infection, despite the lack of commercially available tests for air or surface presence of Coronavirus, and despite the shortage of either rapid or laboratory COVID-19 tests and testing sites that could have otherwise resulted in testing being administered to every individual who was on-site at the relevant times.[86]

93.     Early in the course of Coronavirus and COVID-19, testing was limited, and thus potentially thousands more people were infected than were reported.[87]  National and local incidence and prevalence rates clearly demonstrated the high magnitude of COVID-19 infections (and deaths) and the pervasiveness of Coronavirus throughout Texas and in the states and counties where the Texas Clothing's properties (including the Haggar Stores), **Attraction Properties**, and **Dependent Locations** (including the Wholesale Stores) were operated.  Moreover, deaths recorded in Texas point to a much higher prevalence of infectious cases than the number of positive COVID-19 tests actually reported in the area, and reliable statistical models have established with certainty or high probability that Coronavirus was present at Texas Clothing's properties.

94.     Epidemiologists have explained that "the percent positive is a critical measure because it

---

[86] *See, e.g.,* Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment,* 4 NATURE HUM. BEHAV. 1313-19 (Nov. 9, 2020), https://www.nature.com/articles/s41562-020-01000-9 (last visited Mar. 9, 2022), **Ex. 61**.

[87] *See, e.g.,* Benedict Carey & James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say,* N.Y. TIMES (updated July 6, 2020), https://nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited Mar. 9, 2022), **Ex. 62**.

gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[88] The percent positive is a crucial indicator to determine whether a business can safely remain open. As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[89]

95.    Texas presents a powerful example of how statistical modeling confirms the presence of Coronavirus at Texas Clothing's properties (in addition to its certain presence as demonstrated by the large number of Texas Clothing employees who reported contracting COVID-19).

96.    As of March 31, 2020, Texas' positivity rate was over double the 5% guideline, with a 7-day moving average of 11.7%.[90] By July 8, 2020, the positivity rate in Texas jumped to 20.5%, four times higher than the 5% guideline, indicating uncontrolled community spread of Coronavirus in Texas during that time.[91]

97.    As shown below, by way of example, the cities and states where the Haggar Stores operate were experiencing exceptionally high positivity rates:

- **New York State**: As of March 31, 2020, New York State reported a daily positivity rate of 50.4.%, a 7-day rolling average of 45.1%, and a 14-day rolling average of 39.5%.[92]

- **Philadelphia**: As of April 12, 2020, the positivity rate in Philadelphia was 35.7%.[93]

- **Connecticut**: As of March 31, 2020, the statewide 7-day rolling test positivity rate was 35% in Connecticut.[94]

---

[88] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS BLOOMBERG SCH. PUB. HEALTH (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited Mar. 9, 2022), **Ex. 63**.

[89] *Id.*

[90] *Daily Stat-by-State Testing Trends*, JOHN HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/texas (last visited Mar. 9, 2022).

[91] *Id.*

[92] *Percentage Positive Results by Region Dashboard*, NY.GOV (updated Mar. 9, 2022), https://forward.ny.gov/percentage-positive-results-region-dashboard (last visited Mar. 9, 2022).

[93] *Coronavirus Disease 2019 (COVID-19)*, CITY PHILA. (updated Mar. 9, 2022), https://www.phila.gov/programs/coronavirus-disease-2019-covid-19/testing-and-data/#/ (last visited Dec. 7, 2021).

[94] *COVID-19 in Connecticut: Data Analysis*, DATAHAVEN (Nov. 11, 2020), https://www.ctdatahaven.org/reports/covid-19-connecticut-data-analysis (last visited Mar. 9, 2022).

- **New Jersey**: By March 27, 2020, New Jersey's state-run and commercial laboratories administered 28,043 Coronavirus tests since the outbreak started, producing 8,296 positive tests – a positivity rate of 33.4%.[95]

- **Georgia**: As of March 31, 2020, Georgia had a 7-day moving positivity average rate of 22.2%.[96]

- **Tennessee:** As of March 22, 2020, Tennessee had a 7-day positivity rate of 17.9%.[97]

- **Colorado:** As of December 5, 2020, the Colorado Department of Public Health issued a modeling report that estimated 16.5% of the state's 5.8 million residents had been infected to date and that 1 in 40 Coloradans were infectious.[98]

- **Nevada**: As of April 1, 2020, Nevada had a daily positivity 7-day moving average of 13.8%.[99]

- **Pennsylvania**: As of March 31, 2020, the positivity rate in Philadelphia was over 12% with 4,843 positive cases and 63 deaths.[100]

- **California:** As of April 5, 2020, California reported a 7-day positivity rate of 11.8%.[101]

- **Ohio:** As of April 1, 2020, Ohio had a daily positivity 7-day moving average of 11.4%, which continued to rise to 24.2% as of April 21, 2020.[102]

---

[95] Brent Johnson, *N.J. coronavirus cases spike to 8,825 with 108 deaths. Officials announces 1,982 new positive tests, marking another big 24-hour surge.*, NJ.COM (updated Mar. 28, 2020), https://www.nj.com/coronavirus/2020/03/nj-coronavirus-cases-spike-to-8825-with-108-deaths-officials-announce-1982-new-positive-tests-marking-another-big-24-hour-surge.html (last visited Mar. 9, 2022).

[96] *Daily State-By-State- Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/georgia (last visited Mar. 9, 2022).

[97] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/tennessee (last visited Mar. 9, 2022).

[98] Noelle Phillips, 1 in 40 Coloradans are positive for COVID-19, state modeling report says, DENVER POST (Dec. 5, 2020), https://www.denverpost.com/2020/12/05/colorado-covid-outbreak-rate-december-2020/ (last visited

[99] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/nevada (last visited Mar. 9, 2022).

[100] *See PA Coronavirus (COVID-19) Update Archive March 2020*, PA. DEP'T HEALTH (Mar. 31, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/March-Archive.aspx (last visited Mar. 9, 2022).

[101] *Tracking COVID-19 in California*, COVID19.CA.GOV (updated Mar. 9, 2022), https://covid19.ca.gov/state-dashboard/ (last visited Mar. 9, 2022).

[102] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/ohio (last visited Mar. 9, 2022).

- **Florida**: On March 29, 2020, the 7-day positivity rate for those taking COVID-19 tests in Florida was 10% with a daily rate of 13%.[103]

- **Arizona**: As of April 17, 2020, Arizona had a daily positivity 7-day moving average of 11.0%. Arizona's daily positivity 7-day moving average subsequently rose to 19.2% as of July 6, 2020.[104]

- **North Carolina:** As of April 21, 2020, the 7-day positivity rate in North Carolina was 10.6% with 271,000 positive cases. In January 2021, the positivity rate in North Carolina again spiked, rising to 18% by January 8, 2021.[105]

- **Virginia**: As of March 31, 2020, Virginia had a 7-day moving positivity average rate of 9.4%.[106]

- **Oregon**: For the week of March 7-13, Oregon reported a positivity rate of 7.7%.[107]

98.     The other states where the Haggar Stores operate or operated and where Texas Clothing's customers operate the **Dependent Locations** (including the Wholesale Stores) experienced a similar spread of Coronavirus and COVID-19 and the same physical loss of or damage to property as Texas Clothing experienced in Texas.

**F.     The Presence of Coronavirus in the Indoor Air of Texas Clothing's Properties As Well As on Surfaces Caused The Physical Loss of or Damage to those Properties by Physically Altering the Air and the Surfaces of those Properties as Well as Causing The Loss, In Whole or in Part, Of the Functional Use of those Properties**

99.     Due to the prevalence (ratio of infected persons in a population) and incidence (ratio of

---

[103] *Florida Dept. of Health Updates New COVID-19 Cases, Announces Three New Deaths Related to COVID-19, Morning Updated*, FLORIDAHEALTH.GOV (Mar. 30, 2020), http://www.floridahealth.gov/newsroom/2020/03/033020-1100-covid19.pr.html (last visited Mar. 9, 2022).
[104] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/arizona (last visited Mar. 9, 2022).
[105] *Daily State-By-State Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/north-carolina (last visited Mar. 9, 2022).
[106] *Daily State-By-State- Testing Trends*, JOHNS HOPKINS UNIV. MED. (updated Mar. 9, 2022), https://coronavirus.jhu.edu/testing/individual-states/virginia (last visited Mar. 9, 2022).
[107] *Oregon's weekly COVID-19 positivity rate is the highest it's been since March*, KGW8 (Aug. 3, 2020), https://www.kgw.com/article/news/health/coronavirus/oregon-weekly-covid-19-positivity-rate-highest-since-march/283-d6bb8928-9df1-4b9c-9a79-4fec4d6ecdac (last visited Mar. 9, 2022).

new cases) of COVID-19 infections in the U.S., Texas Clothing's properties (including the Haggar Stores) were repeatedly exposed, invaded and physically altered by the airborne Coronavirus from infected patrons and employees, some of whom would have been asymptomatic and unknowing spreaders of Coronavirus. Coronavirus can be released into the air when infected persons breathe, talk, cough, sneeze, or sing, and such releases can infiltrate ventilation systems, as well as myriad surfaces (i.e., fomites), such as dermal contact surfaces (e.g., clothing, clothing racks, counters, dressing rooms, point of sale locations, etc.). Coronavirus has deposited, and continues to deposit, and therefore elevate contagion risks on, myriad dermal contact surfaces, which are transformed into disease-spreading fomites. These fomites can pose transmission risks for persons contacting those surfaces.

100.    It is undisputed that air within a property laden with asbestos fibers is unsafe for people. It is no different for a property that has Coronavirus physically invading and physically altering its air – the building has been damaged because the virus invades and physically alters and transforms the air and makes it unsafe for breathing.

101.    The introduction of Coronavirus into the indoor air at Texas Clothing's properties directly and physically changes, alters, and transforms the composition of the air – such that it now contains a concentration of potentially deadly SARS-CoV-2 infectious particles and virions (whereas before it did not). The presence of Coronavirus in the air of Texas Clothing's properties physically alters and transforms indoor air on the property into a transmission vector for COVID-19. And the presence of Coronavirus impairs the functional use of the property in the same manner as the presence of any other hazardous, toxic or noxious substance would, causing the physical loss of or damage to the property.

102.    As with asbestos in the air, the presence of an unsafe agent, such as Coronavirus, in the air of the premises alone results in risk. In fact, the risk of death due to exposure to Coronavirus is orders of magnitude higher than the risk of death due to exposure to asbestos. Indeed, recent estimates indicate that approximately 2,600 Americans die from asbestos exposure (mesothelioma) per year, compared with over

459,000 deaths of Americans due to Coronavirus exposure in 2021.[108]  It is undisputed that the air within a property filled with asbestos fibers is unsafe for people.  It is no different for a property that has Coronavirus – an external force – physically invading and physically altering its air space; in fact, the Coronavirus is exponentially more deadly than exposure to asbestos fiber.

**G.    The Closure of the Haggar Stores**

103.    By mid-March 2020, Texas Clothing began to receive information about the escalating presence of Coronavirus and COVID-19 in the areas where the Haggar Stores are located.  Reports to Texas Clothing of infections in the states and cities where the Haggar Stores operated (and the impending physical loss of or damage to its property from Coronavirus and COVID-19) increased and escalated in the days prior to Texas Clothing's decision to close all of the Haggar Stores.

104.    By March 16, 2020, deadly Coronavirus invaded, entered and infiltrated the indoor air of properties in the areas where the Texas Clothing's properties were located, physically altering and damaging that air and physically transforming it from a safe state into a state that was dangerous to breathe, causing those properties to become unsafe, uninhabitable and unfit for their intended use, and causing them to lose, in whole or in part, their full functional use.  Simply put, the physical presence of Coronavirus at Texas Clothing's properties transformed them from a satisfactory state into an unsatisfactory state.

105.    On March 16 and March 17, 2020, nine of the Haggar Stores located in Connecticut (1 Store), Maryland (1 Store), Nevada (1 Store), and Pennsylvania (6 Stores) closed in response to civil authority orders issued by their respective state or local governments in response to the direct physical loss of or damage to property within one mile of the Haggar Stores caused by Coronavirus or COVID-19 (the "Civil Authority Orders").

106.    On March 18, 2020, Texas Clothing closed the remainder of its 74 Haggar Stores company-wide (an additional 65 Stores), whether or not those specific Stores were under any state, provincial, local or other government order to close.

---

[108] Rengyi Xu et al., *Association between mesothelioma and non-occupational asbestos exposure: systematic review and meta-analysis*. 17 ENV'T HEALTH 1, 90 (Dec. 19, 2018), https://ehjournal.biomedcentral.com/articles/10.1186/s12940-018-0431-9 (last visited Mar. 9, 2022), **Ex. 64**.

107.    Accordingly, by the close of business on March 18, 2020, Texas Clothing had closed all of its 74 Haggar Stores then in existence.

108.    On March 18, 2020, approximately 87.8% (65) of all of the Haggar Stores were not under any government order requiring them to be closed as of that date.  Particularly, those approximately 65 Haggar Stores that closed prior to any obligation to do so by government order were located in the following states:

- **Alabama:** 1 Store

- **Arizona:** 3 Stores

- **California:** 1 Store

- **Colorado:** 1 Store

- **Delaware:** 1 Store

- **Florida:** 7 Stores

- **Georgia:** 5 Stores

- **Kansas:** 1 Store

- **Kentucky:** 1 Store

- **Louisiana:** 2 Stores

- **Michigan:**  3 Stores

- **Minnesota:** 1 Store

- **Missouri:** 3 Stores

- **Nebraska:** 1 Store

- **New Hampshire:** 1 Store

- **New Jersey:** 1 Store

- **New York:** 2 Stores

- **North Carolina:** 3 Stores

- **Ohio:** 4 Stores

- **Oklahoma:** 1 Store

- **Oregon:** 1 Store

- **<u>South Carolina</u>:** 5 Stores
- **<u>Tennessee</u>:** 2 Stores
- **<u>Texas</u>:** 13 Stores
- **<u>Virginia</u>:** 1 Store.

109.    The escalating presence of Coronavirus in the areas where the Haggar Stores were located, demonstrating the actual or imminent presence of Coronavirus in the air and on the surfaces of these Stores, the physical alteration to the air and the surfaces and their consequent uninhabitability and unfitness for their intended use, was a watershed event in Texas Clothing's history, justifying and necessitating the closure of these 65 Stores in advance of any government-mandated closures.

110.    Texas Clothing's decision to close these 65 Stores was due the risk of or the direct physical loss of or damage to its property from the actual or imminent presence of Coronavirus and COVID-19 at the Haggar Stores and at its **Attraction Properties** and to prevent actual or imminent direct physical loss or damage to the Haggar Stores from the imminent presence of Coronavirus and COVID-19 at the Haggar Stores.

111.    As of Texas Clothing's March 18, 2020 closure of all of the Haggar Stores, approximately 9 of its Stores (12.1% of the total number of Haggar Stores) were subject to the Civil Authority Orders. The 9 Haggar Stores so affected were located in the following jurisdictions:  Connecticut, Maryland, Nevada, and Pennsylvania.

112.    In mid-to-late March 2020, Texas Clothing began receiving notices from various of its **Dependent Locations** (including the Wholesale Stores), informing Texas Clothing that they were also closing their properties, canceling their orders, and/or unilaterally extending the payment terms for Texas Clothing products, due to the risk of or the direct physical loss of or damage to their properties caused by Coronavirus and COVID-19.

113.    By way of example only:

- On March 17, 2020, Boscov's notified Texas Clothing that 30 of its 48 stores were closed and the remaining stores were expected to close before the end of the week, explaining Boscov's believed the closures were "a necessary response to slow the spread of the virus".

- On March 17, 2020, Nordstrom informed Texas Clothing that to "do [its] part in slowing the spread of the virus [Nordstrom] ha[d] decided to temporarily close all of [its] stores" for two weeks.

- On March 31, 2020, Tailored Brands informed Texas Clothing that it had announced the temporary closure of all its stores on March 26, 2020, and in light of the impact of COVID-19 on its business unilaterally "extend[ed] payment terms on all existing merchandise payables by 90 days until further notice."

114.    Between March 16, 2020 and April 9, 2020, state, provincial or local authorities in every U.S. state in which the Haggar Stores were operated, issued orders that would have required Texas Clothing to close or severely restrict its operations at all of its Stores in that state.  However, Texas Clothing had already closed approximately 65 of its Stores prior to the effective date, and in many cases, issuance, of those orders.  Accordingly, those orders did not cause the closure of any of those 65 Haggar Stores.  They were already closed.

115.    With respect to the 9 Haggar Stores that were closed as a result of the Civil Authority Orders, those orders prohibited access to the Haggar Stores – all of which are insured **Locations** under the Policy as well as to **Attraction Propertie**s near the Haggar Stores.  Upon information and belief, these and similar civil authority orders also prohibited access to Texas Clothing's **Dependent Locations** (including the Wholesale Stores).

116.    Many of these and other government orders arising from Coronavirus and COVID-19 expressly recognized that Coronavirus damages property – not just people.  The orders issued in Dallas, Texas, Louisiana, and Nevada – where several of the Haggar Stores are or were located – are prime examples.

117.    For example, on March 31, 2020, Dallas County issued an order directing Texans to stay home except for Essential Activities and closing all Non-Essential Businesses in Dallas County.[109]

---

[109] Dallas County, Tex. Order, *Amended Order of County Judge Clay Jenkins, Stay Home Stay Safe* (Mar. 31, 2020), https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/2020/march/033120-DallasCountyOrder.pdf (last visited Mar. 9, 2022).

Among other things, the March 31, 2020 order expressly stated, among its justifications, that "[t]he COVID-19 virus caused property loss or damage due to its ability to attach to surfaces for prolonged periods of time . . ."[110]

118.    Similarly, on March 22, 2020, Governor Edwards of Louisiana issued Proclamation Number 33 JBE 2020, ordering the closure of all state office buildings to the public and directing individuals to stay-at-home unless performing an essential activity.[111]  Among other things, the Louisiana Proclamation expressly stated, among its justifications, that the order and other "measures relating to closure of certain businesses and to limit the operation of non-essential business are necessary because of the propensity of COVID-19 to spread via personal interactions and because of physical contamination of property due to its ability to attach to surfaces for prolonged periods of time . . ."[112]

119.    In Nevada, Governor Sisolak issued the Emergency Directive 016 on April 29, 2020, which among other things extended Emergency Directive 010 and the closure of non-essential retail businesses (such as the Haggar Store located in Nevada).[113]  Among other things the Emergency Directive expressly stated, among its justifications, that "the ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate period of time renders some property unusable and contributes to contamination, damage, and property loss[.]"[114]

120.    The cause of these and other Civil Authority Orders and Texas Clothing's ensuing Time Element (business interruption loss) was Coronavirus and COVID-19.

---

[110] *Id.*
[111] La. Exec. Proclamation No. 33 JBE 2020, *Additional Measures for COVID-19 Stay at Home* (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/33-JBE-2020-Public-Health-Emergency-COVID.pdf (last visited Mar. 9, 2022).
[112] *Id.*
[113] Nev. Emerg. Directive No. 016 (Apr. 29, 2020), http://web.archive.org/web/20200502082433/https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016/ (last visited Mar. 9, 2022).
[114] *Id.*

**H.    The Haggar Stores Reopen but Operate Under Severe Restrictions and With Safety Measures That Forced Texas Clothing to Incur Extra Expenses to Continue Operating and Prevent Further Direct Physical Loss of or Damage to its Property and These Measures Failed to Prevent the Presence of Coronavirus at the Stores, Which Physically Altered Them And Caused Yet More Physical Loss of or Damage to Texas Clothing's Property**

121.    Beginning on May 22, 2020, Texas Clothing started reopening the Haggar Stores.  By July 7, 2020, all but three of the 74 Stores had re-opened.

122.    The reopening of the Haggar Stores did not abate Texas Clothing's losses arising from the direct physical loss of or damage to its property, its **Attraction Properties**, or its **Dependent Locations**. To the contrary, to temporarily protect or preserve Covered Property due to actual or imminent physical loss or damage to Texas Clothing's property and/or in order to prevent further direct physical loss of or damage to the Haggar Stores and to stay open and continue operating its Stores and Wholesale Business, Texas Clothing has incurred significant extra expenses and imposed restrictions on certain of its services. These costs/expenses/restrictions include, but are not limited to:

- operating the Haggar Stores at reduced hours of operation;

- operating the Haggar Stores at a fraction of their normal occupancy;

- purchasing and providing PPE to its employees such as facemasks and gloves;

- installing barriers (such as in reception and point of sale areas) to hamper transmission of Coronavirus and foster social distancing;

- making hand sanitizer, disinfecting wipes, soap and water readily available to employees and customers;

- purchasing and placing readily visible signage to encourage safe practices among employees and customers;

- regularly and frequently cleaning any high-touch and frequently touched surfaces according to heightened CDC and state department of health guidelines;

- providing equipment cleaning products throughout the Stores for use on high contact surfaces, including point of sale areas;

- dramatically increasing cleaning frequency for its Stores and their bathrooms;

and

- upgrading HVAC ventilation filters in various of Texas Clothing's properties.

123.    Despite these concerted safety processes, Texas Clothing has not completely escaped the risks of exposure to and infection from Coronavirus as over 80 Texas Clothing employees have reported to Texas Clothing that they contracted COVID-19 since March 2020.

124.    The presence of Coronavirus on Texas Clothing's properties after its Stores reopened caused Texas Clothing to suffer direct physical loss of or damage to its Stores as previously alleged herein.

125.    The reduced hours, reduced capacity, and significant restrictions on the Haggar Stores, some imposed by government orders, have deprived Texas Clothing of the full functional use of its property, causing further direct physical loss of or damage to Texas Clothing's property.  Moreover, these closures, restrictions, and related measures discussed herein have alienated some of Texas Clothing's current and prospective customers, causing Texas Clothing to sustain yet more losses.

I.    **The Devastating Toll to Texas Clothing from Coronavirus and COVID-19**

126.    Texas Clothing experienced direct physical loss of or damage to its property in at least three ways:

(1) the presence of Coronavirus in the indoor air and on surfaces at each of Texas Clothing's properties (including the Haggar Stores) physically altered and transformed the content of the air and the surfaces at the Haggar Stores and at other Texas Clothing properties and also caused the loss, in whole or in part, of the functional use of those properties;

(2) through the need to modify physical behaviors through the use of social distancing, avoiding confined indoor spaces, and avoiding congregating in the same physical area as others, in order to reduce or minimize the potential for viral transmission; and

(3) through the need to mitigate the threat or actual physical presence of Coronavirus on frequently-touched surfaces and objects, including door handles, bathroom faucets, miscellaneous surfaces, as well as in heating and air conditioning systems and in or on any other of the multitude of places that Coronavirus has been or could be found.

127.    Coronavirus's and COVID-19's impact to Texas Clothing's business in Texas and across

the United States cannot be overstated.

128.    Texas Clothing's business derives its revenue from the operation of (1) the 16 Haggar Stores (74 at the onset of Coronavirus and COVID-19) and (2) the Wholesale Business which relies on the continued operation of Texas Clothing's **Dependent Locations** (including the Wholesale Stores).  If those stores are closed, Texas Clothing earns dramatically less revenue.  And if the Haggar Stores and Wholesale Stores only operate at limited capacity, its revenues sharply decline from pre-COVID-19 levels.

129.    From March 18, 2020 until May 22, 2020, all of the Haggar Stores were closed.  From the beginning of the Haggar Stores reopening on May 22, 2020, all of those Stores, at varying points in time, were forced to operate under severe restrictions such as limiting their hours of operation and occupancy levels.  Moreover, after the Stores' reopening, the continuous and repeated presence of Coronavirus at the Haggar Stores and at other Texas Clothing property has caused the physical loss of or damage to that property, resulting in a slowdown or cessation (defined in the Policy as a "Suspension") of Texas Clothing's business operations.  Thus, the physical loss of or damage to Texas Clothing's properties has dramatically decreased Texas Clothing' revenues.

130.    Texas Clothing's losses to date exceed $50 million.

131.    Of course, the devastation to Texas Clothing's property and business should come as no surprise given the toll COVID-19 has wreaked throughout the United States.  Coronavirus and COVID-19 could result in net losses starting at $3.2 trillion and reaching as much as $4.8 trillion in U.S. real gross domestic product over the course of two years.[115]  Between February 2020 and April 2020, there was a net loss of over 1.4 million jobs in Texas – an overall loss of 11.2% of jobs across all industries.[116]

132.    The fashion industry has been especially impacted by Coronavirus and COVID-19.  Due to the pervasiveness of Coronavirus, retail stores and boutiques upon which the industry relies to do

---

[115] Emily Gersema, *Business closures and partial reopenings due to COVID-19 could cost the U.S. trillions*, USC NEWS (Nov. 30, 2020), https://news.usc.edu/178979/business-closures-covid-19-pandemic-united-states-gdp-losses/#:~:text=The%20COVID%2D19%20pandemic%20could,years%2C%20a%20USC%20study%20finds (last visited Mar. 9, 2022).
[116] Michael Ettlinger & Jordan Hensley, *COVID-19 Economic Crisis: By State*, UNIV. N.H. CARSEY SCH. PUB. POL'Y (updated Oct. 22, 2021), https://carsey.unh.edu/COVID-19-Economic-Impact-By-State (last visited Mar. 8, 2022).

business have sustained devastating physical loss of or damage to their property, and in the wake of the havoc wrought by Coronavirus and COVID-19, iconic fashion groups, brands, and stores have been forced into bankruptcy, including such companies as Tailored Brands (owners of Men's Warehouse and JoS A. Bank) and J.C. Penney (both Texas Clothing Wholesale Customers) as well as Neiman Marcus, Brooks Brothers, J.Crew, and Ascena Retail (owner of Ann Taylor and Lane Bryant).[117]

133.    Indeed, in February 2020, experts predicted $43 billion in losses within the luxury fashion segment due to Coronavirus and COVID-19.[118]  Just a month later, the United Nations predicted COVID-19-related losses within the fashion industry would reach $50 billion.[119]

134.    The loss of life has also been devastating and reflective of the damage wrought by Coronavirus and COVID-19 and its pervasiveness in any business premises open to the public.  As of March 8, 2022, COVID-19 has killed over 85,878 Texans,[120] 957,752 Americans,[121] and 6 million people worldwide.[122]  Recent reports estimate that the actual number of people worldwide killed by COVID-19 directly or indirectly is closer to 19.9 million people.[123]  COVID-19 is now the third-leading cause of death in this country, surpassed only by heart disease and cancer.[124]  At its peak, over 4,000 Americans

---

[117] Layla Ilchi, *All the Major Fashion Brands and Retailers Severely Impacted by the COVID-19 Pandemic*, WOMEN'S WEAR DAILY (Dec. 24, 2020), https://wwd.com/fashion-news/fashion-scoops/coronavirus-impact-fashion-retail-bankruptcies-1203693347/ (last visited Mar. 9, 2022).

[118] Zoe Suen, *Luxury Braces for $43 Billion in Losses as Coronavirus Panic Goes Global*, BUS. FASHION (Feb. 24, 2020), https://www.businessoffashion.com/articles/global-markets/luxury-braces-for-43-billion-in-losses-as-coronavirus-panic-goes-global (last visited Mar. 9, 2022).

[119] *The UN quantifies the impact of the coronavirus on the fashion industry: 1.5 billion dollars*, MDS: GLOB. FASHION BUS. J. (Mar. 5, 2020), https://www.themds.com/markets/the-un-quantifies-the-impact-of-the-coronavirus-on-the-fashion-industry-15-billion-dollars.html (last visited Oct. 2, 2021).

[120] *Tracking Coronavirus in Texas: Latest Map and Case Count*, N.Y. TIMES (updated Mar. 9, 2022), https://www.nytimes.com/interactive/2021/us/texas-covid-cases.html (last visited Mar. 9, 2022).

[121] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction,* CDC (updated Mar. 8, 2022), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Mar. 8, 2022).

[122] *WHO Coronavirus (COVID-19) Dashboard*, WHO (updated Mar. 9, 2022), https://covid19.who.int/ (last visited Mar. 9, 2022).

[123] *The pandemic's true death toll,* ECONOMIST (updated Mar. 9, 2022), https://www.economist.com/graphic-detail/coronavirus-excess-deaths-estimates (last visited Mar. 9, 2022).

[124] Youyou Zhou & Gary Stix, *COVID-19 Is Now the Third Leading Cause of Death in the U.S.*, SCI. AM. (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited Mar. 9, 2022), Ex. 65; Farida B. Ahmad & Robert N. Anderson, *The Leading Causes of Death in the US for 2020* (Mar. 31, 2021), https://jamanetwork.com/journals/jama/fullarticle/2778234 (last visited Mar. 9, 2022), **Ex. 66**.

were perishing per day from COVID-19.[125]  A substantial number of Americans are still dying daily, with surges of cases and new and ever more contagious variants of Coronavirus occurring throughout the U.S. – the Omicron variant in particular.[126]

135.    Thus, the damage to Texas Clothing and others will only continue.

**J.      The "All Risk" Commercial Property Policy and Applicable Coverages**

136.    In exchange for a substantial premium (over $267,000), Zurich sold Texas Clothing the Policy, number PPR0186522-04, for the November 1, 2019 to November 1, 2020 policy period (i.e., the Policy).  The Policy provides coverage for property losses, for business interruption losses ("Time Element" per the policy language), and other losses.  The policy limit for the Policy is $170,993,687.

137.    Texas Clothing fully paid the premiums for the Policy.

138.    Zurich and/or its affiliates drafted the Policy, including the Zurich EDGE™ coverage form. Texas Clothing played no role in drafting or negotiating the Policy or the included Zurich EDGE™ coverage form.

139.    When introduced in 2008, the Zurich EDGE™ coverage form was marketed as offering uniquely "broader coverage and greater flexibility" and would "enhance . . . our ability to serve customers in this important line of business and offers significant advantages for global property programs . . . ." Zurich's CEO made this announcement in a press release, dated April 22, 2008, and lauded the clarity of the form, boasting that "The Zurich Edge policy is clearly written with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations."[127]

---

[125] Eugene Garcia et al., *U.S. tops 4,000 daily deaths from coronavirus for 1st time*, AP NEWS (Jan. 8, 2021), https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited Mar. 9, 2022), **Ex. 67**.

[126] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, CDC (updated Mar. 9, 2022), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths (last visited Dec. 7, 2021); Lisa Maragakis, *Coronavirus Second Wave, Third Wave and Beyond: What Causes a COVID Surge*, JOHNS HOPKINS MED. (updated Oct. 21, 2021), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (last visited Mar. 9, 2022), **Ex. 68**.

[127] *Zurich introduces The Zurich Edge™ for highly protected risks and global property markets*, Media Release, ZURICH (Apr. 22, 2008), https://zsl.zurichna.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!OpenDocument&Click= (last visited Mar. 9, 2022).

140.    Zurich also touted the EDGE™ coverage form to insurance regulators.  For example, in an Explanatory Memorandum Zurich filed with the California Department of Insurance and the Oregon Insurance Division on January 11, 2008 and February 5, 2008, respectively, Zurich claimed that the EDGE™ coverage form offers "our Insured's [sic] a very broad and flexible policy."

141.    The Policy sold to Texas Clothing insures against "[a]ll risks of direct physical loss of or damage from any cause unless excluded," and provides coverage for property damage losses, business interruption losses ("Time Element" per the policy language), and other losses.

142.    The phrase "physical loss of or damage" is not defined or limited in the Policies.  In plain English, "physical loss of or damage" to property denotes at least the following meanings: (1) physical damage to that property; (2) the physical alteration of that property; (3) the interaction of an external physical substance or force with that property, including its presence in the air or on the surfaces of that property, rendering the property unfit, unsafe or uninhabitable for normal use, causing that property to lose, in whole or in part, its functional use or otherwise negatively affecting the property's usability; or (4) the loss of use or the loss of functional use, whether in whole or in part, of that property.

143.    Moreover, because the Policy covers "all risks of" direct physical loss of or damage from any cause unless excluded, actual physical loss of or damage to property is not required to trigger the Policy's coverage.  The risk of such physical loss of or damage to covered property triggers the Policy's coverage.

144.    In 2013, the Insurance Services Office ("ISO") recommended that its members (including Zurich) delete the "risks of" language from their all-risk commercial property policies because of a concern that it provided broader coverage than insurer may wish to provide.  Zurich followed that guidance in other property policy forms.  *See* Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleading at Ex. D, *QDOBA Restaurant Corp. v. Zurich Am. Ins. Co.*, No. 1:20-cv-03575-DDD-SKC (D. Co. Feb. 28, 2022), ECF No. 69-4 (Defendant Zurich American Insurance Company's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint at Ex. 2, *Down Ford, Inc. v. Zurich*, No. 3:20-cv-08595-BRM-ZNQ (D.N.J. July 17, 2020), ECF No. 4-3), Ex. 69**.**  Zurich, however, chose to retain the coverage-broadening "risk of" language in its top-end Zurich EDGE form, which compromises the

Policy.

145.    The Policy Limit is $170,993,687 "for the total of all coverages". The full Policy limit applies to losses claimed under the Policy's Property Damage and Time Element coverages.

146.    The Policies do not exclude virus, pandemics, communicable disease, COVID-19 or Coronavirus as causes of loss. Thus, under both the Policy, its entire $170,993,687 Policy Limit is available for Texas Clothing's losses.[128]

147.    The Policy's full terms and conditions are set forth therein, but as relevant here, the Policy provides as follows:

**1.    <u>Time Element and Time Element Coverages</u>**

148.    The Policy covers Time Element loss resulting from "the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**[.]"

149.    The Policy defines **Suspension** as the "slowdown or cessation of the Insured's business activities[.]"

150.    The Policy further defines **Suspension** "as respects rental income that a part or all of the Insured Location is rendered untenantable."

151.    Accordingly, the Policy's definition of **Suspension:** (a) provides Time Element (business interruption) coverage to Texas Clothing for operating its business while impaired as a result of physical loss of or damage to covered property not otherwise excluded such as a partial loss of functional use of an Insured Location; and (b) does not condition Time Element (business interruption) coverage on a total shutdown of Texas Clothing's business operations such as the total uninhabitability, complete or even partial untenantability or a total loss of functional use of an Insured Location.

152.    Each of Texas Clothing's Stores, among other Texas Clothing facilities (e.g., corporate

---

[128] Zurich asserts, and Texas Clothing disagrees, that virus-related losses are excluded under the Policy.

offices), is an Insured Location under the Policy.

153.    The Policy defines **Covered Cause of Loss** as "All risks of direct physical loss of or damage from any cause unless excluded."

154.    As set forth above, Coronavirus and COVID-19 caused direct physical loss of or damage to property at Texas Clothing's Insured Locations by, among other things, physically altering that property.  Coronavirus and COVID-19 also rendered such property unfit and unsafe for its normal usages or caused the loss, in whole or in part, of functional use of Texas Clothing's property, depriving Texas Clothing of its property.

155.    Neither Coronavirus nor COVID-19 is excluded under the Policy.[129]

156.    Among the Policy's Time Element Coverages is GROSS EARNINGS for "the actual loss sustained by the Insured during the Period of Liability."  GROSS EARNINGS is subject to the Policy's full Limit of Liability of $170,993,687, subject to a 6-month Time limitation.

157.    Texas Clothing derives a large portion of its revenue from its Haggar Stores.  When these Stores are closed Texas Clothing earns dramatically less revenue.  All the Haggar Stores were closed during the Policy Period.

158.    To the extent any of the Stores remained open or were reopened during either Policy Period, this was often at reduced capacity, reduced hours and reduced levels of service.  As such, Texas Clothing has sustained and is sustaining a substantial Time Element loss of its Gross Earnings as insured under the Policy.

159.    The Policies include an EXTENDED PERIOD OF LIABILITY, providing in relevant part: "Upon the termination of the coverage for Gross Earnings loss under 4.02.01.01. this Policy will continue to pay the actual Gross Earnings loss sustained by the Insured" for up to 90 days.

160.    The Policies provide LEASEHOLD INTEREST coverage, covering "the actual Leasehold Interest loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage caused by

---

[129] *See supra* note 128.

a Covered **Cause of Loss** to a building (or structure) which is leased and not owned by the Insured, as follows:

- If the building (or structure) becomes wholly untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured the present value of the actual rent payable for the unexpired term of the lease, not including any options;

- If the building (or structure) becomes partially untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured for the present value of the proportionate amount of the actual rent payable for the unexpired term of the lease, not including any options[.]"

161.    Texas Clothing leases the premises for many of the Haggar Stores.  The presence of Coronavirus made all or substantially all of its Stores wholly or partially untenantable or unusable and yet many of its landlords insisted that Texas Clothing's lease agreements required the continuation of rent. Attached as **Ex. 70** is a list of all of Texas Clothing Stores where Texas Clothing – through Haggar Direct, Inc., a wholly owned subsidiary of Haggar Co. – is or has been in litigation with its landlords over landlord's claims that the leases for the Stores required Texas Clothing to continue paying rent – despite the Stores being partially or totally untenantable or unusable as a result of the Coronavirus and COVID-19.

162.    Accordingly, Texas Clothing incurred LEASEHOLD INTEREST loss covered under the Policy.

163.    The Policy provides EXTRA EXPENSE coverage for "the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

164.    As set forth herein, Texas Clothing incurred covered Extra Expenses to resume and continue as nearly as practicable its normal business activities that would otherwise be suspended due to

direct physical loss of or damage caused by Coronavirus and COVID-19, costs associated with altering its property to protect it from physical loss of or damage, as well as for the safety of its occupants, such as erecting barriers, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.

**2.** **Special Coverages**

165.    The Policy includes numerous Special Coverages that apply to Texas Clothing's losses from Coronavirus and COVID-19.  These include the following, among others:

166.    The Policy provides CIVIL OR MILITARY AUTHORITY coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**.  That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations."

167.    Coronavirus and COVID-19 caused direct physical loss of or damage to property throughout the cities, states, and provinces where Texas Clothing's Stores are or were located, and caused the deprivation of use of such property, including property within one (1) mile of Texas Clothing's Stores, giving rise to the actions of civil authority in those cities, states, and provinces, as set forth herein.  These orders were issued as a result of governments' responses to the presence of Coronavirus, a deadly hazardous substance, in the indoor air and on surfaces of properties open to the public within one (1) mile of each Texas Clothing Store, which caused direct physical loss of or damage to such properties by rendering them uninhabitable, untenantable, unsafe, unfit for their intended use or otherwise causing them to lose, in whole or in part, their functional use.  These orders prohibited access to the Texas Clothing Stores.

168.    The Policy provides CONTINGENT TIME ELEMENT coverage for "the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the

**Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide . . . ."[130]

169.    The Policy defines **Direct Dependent Time Element Locations** as including: "Any **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured;" and "Any **Location** of any company under a royalty, licensing fee or commission agreement with the Insured."

170.    The Policy defines an **Indirect Dependent Time Element Location** as including: "Any **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**;" and "Any **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**."

171.    The Policy defines **Attraction Properties** as: "A property within the distance described in the declarations of an Insured Location that attracts customers to the Insured's business" that is "[l]ocated within 1 mile(s) of the Insured Location."

172.    In plain English, the Policy provides coverage for Texas Clothing's losses if certain types of nearby properties or the properties of Texas Clothing's direct customers or suppliers suffer direct physical loss of or damage unless expressly excluded under the Policy.  The Policy covers all risks of loss and does not contain any relevant exclusions for Texas Clothing's losses.

173.    Among other things, as set forth herein, Coronavirus and COVID-19 caused direct physical loss of or damage at Locations of direct and indirect suppliers, customers and service providers to Texas Clothing's properties (including the Wholesale Stores) and at properties that attract customers to the Texas Clothing Stores, including the many business amenities and tourist attractions within a short distance of the Texas Clothing Stores.

---

[130] With certain geographic exclusions.

174.    Additionally, as set forth herein, Coronavirus and COVID-19 rendered such properties unfit and unsafe for their normal usages or caused the loss, in whole or in part, of functional use of those properties, resulting in the deprivation of use of such properties.

175.    Texas Clothing derives a large portion of its revenue from the operation of its Wholesale business, providing fashion apparel and accessories to various of its customers for sale at their stores (including the Wholesale Stores).  When the stores of Texas Clothing's customers are closed they do not purchase or they decrease their purchases of Texas Clothing products.

176.    To the extent any of these stores remained open or were reopened during the Policy Period, this was often at reduced capacity, reduced hours and reduced levels of service.  As such, Texas Clothing has sustained and is sustaining a substantial Time Element loss under the CONTINGENT TIME ELEMENT coverage.

177.    The Policy provides PROTECTION AND PRESERVATION OF PROPERTY coverage, for "[t]he reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property" and "[t]he Gross Earnings loss or Gross Profit loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property."

178.    Texas Clothing undertook costly measures necessary to protect the Texas Clothing Stores from further loss of or damage and to mitigate its damages.  This included, among other things, altering its property to protect it from physical loss or damage, and taking measures to protect the safety of its employees and customers, including erecting barriers, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.  Additionally, during times of low or no occupancy at or traffic to the Texas Clothing Stores, to mitigate its losses and to protect its property, Texas Clothing incurred costs associated with security, fire monitoring, pest control, utilities and maintenance.

179.    No exclusions apply to Texas Clothing's Claims.

### 3.    The Policy's Contamination Exclusion Does Not Bar Coverage

180.    The Policy contains an exclusion at Section 3.03.01.01 (the "Contamination Exclusion"), which excludes "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy[.]"

*Zurich's Virus Deletion Endorsement*

181.    However, the Contamination Exclusion is deleted in the Policy by endorsement (the "Virus Deletion Endorsement") and replaced with the following exclusionary provision: "**Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." *See* Policy Endorsement, form EDGE-219-C (01/18), **Ex. 71**.

182.    Zurich drafted the Virus Deletion Endorsement.

183.    Texas Clothing had no role in negotiating or drafting the Virus Deletion Endorsement.

184.    The Virus Deletion Endorsement is a pre-printed form in the Zurich EDGE™ form.

185.    The Virus Deletion Endorsement is added to the Policy by endorsement, and by its express terms it applies to all risks located throughout the U.S. and is not limited to property located in Louisiana or to a specific geographic area.

186.    The Virus Deletion Endorsement also deletes and replaces the definitions for **Contamination (Contaminated)** and **Contaminant(s)**, as follows:

- In the Policy (prior to Virus Deletion Endorsement), Zurich defined **Contamination (Contaminated)** as: "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."

- In the Policy (prior to Virus Deletion Endorsement), Zurich also defined **Contaminant(s)** as: "Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**."

- The Virus Deletion Endorsement in the Policy replaces the definition of **Contamination(Contaminated)** with: "Any condition of property due to the actual presence of any **Contaminant(s).**"

- The Virus Deletion Endorsement replaces the definition of **Contaminant(s)** in the Policy with: "Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**."

187.    The Virus Deletion Endorsement thus removes "virus" from the sweep of the Contamination Exclusion.

188.    Section 6.21 of the Policy (known as the "Titles Provision") states that "The titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."

189.    Zurich drafted the Titles Provision of the Policy.

190.    Texas Clothing had no role in drafting or negotiating the Titles Provision of the Policy.

191.    The only time the word "Louisiana" appears in the Virus Deletion Endorsement is in the endorsement's title.

192.    None of the provisions in the Virus Deletion Endorsement reference Louisiana.

193.    None of the provisions in the Virus Deletion Endorsement state that the endorsement, or any portions thereof, applies only to property risks or locations in Louisiana.

194.    Additionally, the Virus Deletion Endorsement states that it modifies the Policies in their entirety, providing in bolded, all capitalized lettering, "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**" (emphasis in original).

195.    Other endorsements to the Policy, however, contain limitations that cabin those endorsements to just the specific state in their title.

196.    For example, the Policy contains a New York state-titled endorsement, entitled "Amendatory Endorsement – New York," which provides "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK**" (emphasis in original).

197.    Similarly, the Policy contains a Connecticut state-titled endorsement, entitled "Amendatory Endorsement – Connecticut," which provides "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT**" (emphasis in original).

198.    Upon information and belief, Zurich has issued policies containing the Virus Deletion Endorsement to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

199.    Upon information and belief, Zurich included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued in 2020 to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

200.    Upon information and belief, Zurich has issued policies containing the Virus Deletion Endorsement to policyholders who have no **Locations**, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

201.    Upon information and belief, Zurich included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued 2020 to policyholders who had no **Locations**, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

202.    Upon information and belief, Zurich included the Virus Deletion Endorsement in all policies containing the Zurich EDGE™ form that it issued in 2020.

*Zurich's Efforts to Change the Virus Deletion Endorsement*

203.    Upon information and belief, when Zurich was faced with escalating claims and lawsuits against it under the Zurich EDGE™ form, it knew that, by virtue of the Virus Deletion Endorsement, the Zurich EDGE™ form did not exclude coverage for losses arising from Coronavirus or COVID-19.  As a result, Zurich tried, but failed, to re-insert the word "Virus" back into the Contamination Exclusion.  In response and after it sold the Policy, Zurich pivoted, seeking and obtaining regulatory approval to add a geographic limitation into the Virus Deletion Endorsement that expressly limited it to only locations in Louisiana.

204.    For example, in December of 2019, just after the emergence of the first COVID-19 cases in China, Zurich filed a regulatory request to modify its policy language.  Buried in the edits, and without reference to the significance of the change, Zurich's filing sought to add an exclusion for Virus, which it sought to become effective in July 2020.

205.     Further, Zurich has recently been seeking regulatory approval for a new EDGE™ II Policy form, which would re-insert the word "Virus" into the Virus Deletion Endorsement and therefore re-insert Virus into the Contamination Exclusion.  At least one state regulator disapproved of the form in 2020.[131]

206.     Having failed to win approval for the EDGE™ II policy form that bore the Virus exclusion and reeling from the wave of COVID-19 claims and lawsuits it faced, Zurich went back to the regulators. This time, Zurich sought and obtained approval for a change to its EDGE™ form policy's Virus Deletion Endorsement to add a geographic limitation to the endorsement to limit its application to only locations in Louisiana – a limitation that does not exist in the Policy issued to Texas Clothing.

207.     The Virus Deletion Endorsement was the only one of the Edge™ policy form's many endorsements that, since the emergence of Coronavirus and COVID-19, Zurich ever sought or obtained regulatory approval to amend.

208.     In its explanatory memo, where it disclosed to the regulators what amendments to the Virus Deletion Endorsement it was seeking to make, Zurich explained that it was making one change – to a minor aspect of premium refunds – and (outside of attaching a redline of the proposed amendments to the Virus Deletion Endorsement) failed to explain or mention that it was also adding a geographical limitation to the endorsement.

209.     Further, in the Fall of 2020, after it began receiving claims for losses sustained as a result of Coronavirus and COVID-19 and the physical loss of or damage to property that they cause, and the accompanying government closure orders (collectively, "COVID Losses") and after being sued across the United States, Zurich sought and received approval for a revised Louisiana endorsement to the Zurich EDGE™ form.[132]  In its regulatory filing, Zurich described the proposed amendment as follows:

---

[131] *See* **Ex. 72** (New York EDGE II Filing) at 2, 6 (submitted to New York on April 3, 2020; disapproved on September 22, 2020). This document was retrieved from the System for Electronic Rate and Form Filing (SERFF) created by the National Association of Insurance Commissioners (NAIC) for submitting and accessing filings. SERFF is the official system used by most states in the U.S.

[132] *See* Ex. 73 (Louisiana EDGE Endorsement Filing, the "Modified Louisiana Endorsement") at 2, 6 (submitted to Louisiana on August 31, 2020; approved on September 8, 2020). This document was also retrieved from SERFF. *See also* **Ex. 74** (Modified Louisiana Endorsement as filed as an exhibit to the complaint in *Watson Woods Healthcare, Inc., et al. v. Zurich Am. Ins. Co.*, No. 1:21-cv-01150 (N.D. Ill.)).

Pursuant to La. Stat. § 22:885(B), Zurich North America and all affiliated companies are updating Louisiana Amendatory Endorsements. **The change removes language concerning premium refunds** attributable to mortgagees when there is a policy cancellation. **The only changes are those in the above referenced code.**

**Ex. 73** at 3, 13 (emphasis added).

210.    However, in addition to removing the language concerning premium refunds and without flagging the addition for the regulator, Zurich also added: "**THIS ENDORSEMENT ONLY APPLIES TO LOCATIONS IN LOUISIANA**." *Id.* at 14. This geographically limiting language is absent in the Virus Deletion Endorsement contained in the Policy and in other Zurich EDGE™ form policies for which Zurich has denied coverage for COVID-19 Losses across the country and around the globe. It is also the only amendment to the Zurich Edge policy form that Zurich has sought and received since the emergence of Coronavirus, COVID-19 and the ensuing massive COVID-19 Losses.

211.    Zurich's various efforts to add a geographic limitation to the Virus Deletion Endorsement, after it issued the Policy, demonstrates Zurich's own recognition that the Virus Deletion Endorsement present in the Policy applies policy wide regardless of location and that Virus is not excluded from coverage by the Policy's Contamination Exclusion

212.    Even in the absence of the Virus Deletion Endorsement, the Policy's Contamination Exclusion applies expressly to "costs" and makes no mention of and therefore does not exclude "loss" – including business interruption loss.

213.    This is significant because, as demonstrated in the chart below, the Policies treat "costs" and "loss" as two separate and distinct concepts in both their coverages and in their exclusions:

**Coverages (Loss vs. Costs)**

|  | Type of Coverage | Description |
|---|---|---|
| **COSTS** | **Decontamination Costs** | If Covered Property is **Contaminated** from direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual not suspected presence of **Contaminant(s)**, then this Policy covers, as a direct |

| | | |
|---|---|---|
| | | result of enforcement of such law or ordinance, the increased **cost** of decontamination and/or removal of such **Contaminated** Covered Property in a manner to satisfy such law or ordinance. . . . |
| | **Protection and Preservation of Property** | The reasonable and necessary **costs** incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property |
| | **Expediting Costs** | This Policy covers the reasonable and necessary **costs** incurred to pay for the temporary repair of direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and to expedite the permanent repair or replacement of such damaged property. |
| | **Professional Fees** | This Policy covers the actual **costs** incurred by the Insured, of reasonable fees paid to the Insured's accountants, architects, auditors, engineers, or other professionals. . . . |
| **LOSS** | **Gross Earnings Loss** | The actual **loss** sustained by the Insured during the Period of Liability |
| | **Civil or Military Authority** | The Company will pay for the actual Time Element **loss** sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. . . . |
| | **Ingress/Egress** | The Company will pay for the actual Time Element **loss** sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations. . . . |
| | **Contingent Time Element** | This Policy covers the actual Time Element **loss** as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from |

| | | direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations**, and **Attraction Properties**. . . . |
|---|---|---|
| | **Protection and Preservation of Property** | The Gross Earnings loss or Gross Profit loss sustained by the Insured . . . prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property |
| | **Tenants Prohibited Access** | The Company will pay for the actual Gross Earnings or Gross Profit loss sustained, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if access to that **Location** by the Insured's suppliers, customers or employees is physically obstructed due to the owner, landlord or a legal representative of the building owner or landlord, prohibiting access to the Insured Location. . . . |

**Exclusions (Loss vs. Costs)**

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| 3.03.01.01. | The following exclusions apply unless specifically stated elsewhere in this Policy: This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. | **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy. |
| 3.03.01.03. | The following exclusions apply unless specifically stated elsewhere in this Policy: This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. | Loss or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, improvement, modification, demolition, occupancy, operation or other use, or removal including debris removal of any property. |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| 3.03.02.01. | This Policy excludes: | **Loss** or damage arising from delay, loss of market, or loss of use. |
| 3.03.02.02. | This Policy excludes: | Indirect or remote **loss** or damage. |
| 3.03.02.03. | This Policy excludes: | **Loss** or damage arising from the interference by strikers or other persons with rebuilding, repairing or replacing property or with the resumption or continuation of the Insured's business. |
| 3.03.02.05. | This Policy excludes: | **Loss** or damage resulting from the Insured's suspension of business activities, except to the extent provided by this Policy. |
| 3.03.03.01. | This Policy excludes direct physical **loss** or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss: | Nuclear reaction or radiation, any by-product of nuclear reaction, any radiological material or radioactive contamination however caused; but if direct physical loss of or damage to Covered Property by fire or sprinkler leakage results, the Company will pay for the loss or damage caused by the fire or sprinkler leakage. |
| 4.02.06.01.01. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any **loss** during any idle period that would have been experienced had the **Suspension** of business activities not occurred. This includes, but is not limited to, when production, operation, services, delivery or receipt of goods or services or any other business activities would have ceased, or would not have taken place or would have been prevented due to: planned or rescheduled shutdown; strikes or other work stoppage; or any reason other than physical loss or damage insured by this Policy. |
| 4.02.06.01.02.01.-04. | In addition to the exclusions elsewhere in this Policy, the | Any increase in Time Element **loss** due to: suspension, cancellation or lapse of any lease, contract, license or orders; fines or damages |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | following exclusions apply to Time Element Coverage; This Policy does not insure against: | for breach of contract or for late or non-completion of orders; penalties of any nature; or any other consequential or remote factors. |
| 4.02.06.01.03. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any **loss** resulting from loss or damage to **Finished Stock**, nor the time required for their reproduction. |
| 4.02.06.01.04. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any Time Element **loss** due to physical loss or damage not insured by this Policy on or off the Insured Location.<br><br>However, in the event that a **Suspension** is due to a **Covered Cause of Loss** and during such **Suspension** a loss that is otherwise excluded occurs, the Company will pay for the Time Element loss which is directly caused by the **Covered Cause of Loss** to Covered Property under this Policy. |
| 4.02.06.01.05. | In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage; This Policy does not insure against: | Any Time Element **loss** resulting from damage to Property of Others; however this exclusion does not apply to Time Element loss suffered by the Insured as a direct result of the damage to Property of Others. |
| 5.02.06.01. | This Coverage does not insure the **costs** to remove: | Property Not Covered that is **Contaminated**; or the **Contaminant** in or on Property Not Covered, whether or not the **Contamination** results from direct physical loss or damage caused by a **Covered Cause of Loss**. This Coverage shall cover the costs of removal of **contaminated** Covered Property or the **Contaminant** in or on Covered Property only if the **Contamination**, due to the actual not suspected presence of **Contaminant(s)**, of the debris resulted from direct physical loss or |

| Provision | Lead-In Language | Exclusion |
|---|---|---|
| | | damage caused by a **Covered Cause of Loss**. |
| 5.02.22. | This Coverage will not include | The fees and <mark>costs</mark> of attorneys, **Public Adjusters**, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them, nor the fees and costs of loss consultants who provide consultation on coverage or negotiate claims. |
| Amendatory Endorsement – Massachusetts, § C.d. | The Company will not pay for | <mark>Loss</mark>, damage or <mark>costs</mark> under this endorsement until the amount of loss, damage or costs exceed $1,000. The Company will then pay the amount of loss, damage or costs in excess of $1,000 up to the applicable limit, subject to all applicable provisions of A. above. This deductible applies whenever there is a **"release of heating oil"** covered under this endorsement. No other deductible will apply to the coverage provided solely by this endorsement. |
| Cyber Event Coverage Endorsement, § D.4. | The following additional exclusions apply to D. 1., 2., and 3. | We will not pay for <mark>loss</mark> or damage to **Digital Assets** resulting from: errors or omissions in programming, processing or copying; or correcting any deficiencies or problems including remediation of **Digital Asset** errors or vulnerabilities that existed prior to the **Cyber Event** and the Insured failed to correct. |
| Cyber Event Coverage Endorsement, § D.4. | The following additional exclusions apply to D. 1., 2., and 3. | We do not cover expenses or <mark>costs</mark> of **Cyber Extortion Payments**. |

214.    Accordingly, the Policy's Contamination Exclusion does not bar coverage for any of Texas Clothing's losses arising from Coronavirus or COVID-19.

215.    Upon information and belief, prior to the sale and issuance of the Policy, Zurich was aware of exclusions being used in the insurance industry that purported to expressly exclude loss from "pandemic" or "pandemics" ("Pandemic Exclusions").

216.    Upon information and belief, Zurich was aware of the risk of an infectious viral pandemic such as Middle East respiratory syndrome ("MERS"), severe acute respiratory syndrome ("SARS") and Avian influenza prior to selling and issuing the Policy.  Nonetheless no Pandemic Exclusions appear in the Policies.

**4.    Texas Clothing's Covered Losses**

217.    Texas Clothing has sustained and is sustaining a substantial Time Element loss of its "gross earnings" as insured under the Policy for its Stores located in the United States.

218.    Gross earnings loss as covered under the Policy is also occurring as Contingent Time Element Loss given the physical loss of or damage to Texas Clothing's **Attraction Properties** and **Dependent Locations,** and as Civil Authority loss as a result of the Civil Authority orders described above.

219.    Texas Clothing is also incurring significant Extra Expense as insured under the Policy in order to resume and continue as nearly as practicable Texas Clothing's normal business activities that otherwise would be necessarily suspended due to the direct physical loss of or damage to its property (the Stores) and those of its **Attraction Properties** and **Dependent Locations**.

220.    Texas Clothing has also incurred substantial expenses for the Protection and Preservation of Property as insured under the Policy in order to temporarily protect or preserve Texas Clothing's Covered Property.  These expenses were necessary due to the actual or imminent physical loss or damage to Texas Clothing's Covered Property.

221.    Texas Clothing also expects that when the calculation of its full losses is fully known, additional coverages under the Policy may be applicable.  The foregoing is not a comprehensive discussion of all potentially applicable coverages, terms, and conditions, which are fully set forth in the Policy.

**K.    Zurich's Denial of Texas Clothing's Claim**

222.    On or about May 8, 2020, Texas Clothing gave notice to Zurich of its and its insured subsidiaries claims falling within the scope of the Policy (the "Notice of Claim").  Specifically, Texas Clothing notified Zurich, it was "sustaining various Business Income and Contingent Business Incomes losses at each of their facilities and across the organization." (the "Texas Clothing Claim" or "Claim").

223.    On May 11, 2020, Zurich through the "assigned []claims professional regarding [Texas Clothing's Claim]," Regann Miller, responded to Texas Clothing's Notice of Claim in an email, notifying Texas Clothing that she would "continue to be in contact with [Texas Clothing] regarding the next steps of the claims process" and would "be in touch" with Texas Clothing "regarding the opening/assignment of loss under the policy in Canada" (the "First Email").  In the First Email, Ms. Miller assured Texas Clothing that that "[t]hroughout the claim process, [she was] available 7 AM until 3:30 PM CST Monday through Friday", that she "value[d] [Texas Clothing's] thoughts, concerns, and [was] committed to fair, accurate and timely service."  Ms. Miller encouraged Texas Clothing to "feel free to contact [her] directly" should it "have any questions regarding the contents of [the First Email], or any other matters [Texas Clothing] wish[ed] to discuss."  Ms. Miller concluded the email by further assuring Texas Clothing she "look[ed] forward to resolving this claim for [Texas  Clothing] as quickly as possible."

224.    On May 12, 2020, Zurich through Ms. Miller sent Texas Clothing another email notifying it she had "requested a claim be opened under the local Canada policy for [Texas Clothing's] losses to the Canadian locations" and was "awaiting follow up of who [was] assigned at [that] time" (the "Second Email").  Included in the Second Email was a request for information from Texas Clothing for "further details relating to the US locations", specifically "the closure reason for each location."  In explaining the information request, Ms. Miller noted that it was "fine" "to 'bucket' the locations by closure reason" if that was "easier", and suggesting as "a couple ideas" that "if there [were] only a few locations that were for example closed by Haggar direction for safety reasons, [Texas Clothing] could always just note those locations, then note the others are Mall Closure or State Mandated."  Ms. Miller included in the Second Email "the most current Statement of Values" to which she "added a column for Closure Reason", encouraging Texas Clothing to "use [that document] if it work[ed]" but noting Texas Clothing did "not have to use [it] if another method [was] easier".  In the Second Email, Ms. Miller also acknowledged some of the difficulties that Texas Clothing was suffering as a result of Coronavirus and COVID-19, noting she was "aware that [Texas Clothing's] staffing [was] currently very low," and encouraged Texas Clothing to "take the time needed to provide these details".  Ms. Miller also acknowledged the uncertainty Texas Clothing was facing at the onset of Coronavirus and COVID-19, stating: "We know that things are

changing sometimes daily and what we know today may be different tomorrow, so please do your best." In the Second Email, Ms. Miller again encouraged Texas Clothing to "not hesitate to reach out" to her "[i]f there [were] any questions regarding the information needed or any others".

225.    On June 12, 2020, Zurich, through Ms. Miller, in an email acknowledged the information Texas Clothing provided regarding the Claims (the "Third Email").  In the Third Email, Zurich also provided to Texas Clothing a Reservation of Rights Letter "under which the investigation into coverage for the [Claim] will proceed." (the "ROR Letter").  Ms. Miller assured Texas Clothing that she was "await[ing] further updates and details from [Texas Clothing] as they become… available" and that Zurich's "investigation remain[ed] ongoing."  Ms. Miller again encouraged Texas Clothing to "let [her] know if there were any questions" after review of the ROR Letter.

226.    The ROR Letter stated it was written "on behalf of Zurich[] with respect to an insurance claim submitted by Texas Clothing[] in connection with the recent outbreak of coronavirus/COVID-19 virus."  Despite acknowledging that the Claims were "at an early stage and with little detailed information [that] has been provided upon which [Zurich could] render any definitive conclusions concerning the availability of insurance coverage or [Texas Clothing's Claim]" and Ms. Miller early assurance to Texas Clothing that their Claims would be handled fairly and accurately, the ROR Letter repeatedly stressed the "trigger language" of the Policy requiring "direct physical loss of or damage to" insured property, and stated unequivocally, without any evidence and in direct contradiction to the science available now and then, "it does not appear that the presence of the COVID-19 virus constitutes direct physical loss or damage to property."  The ROR Letter made this argument with respect to both Texas Clothing's business interruption losses ("Coverage under Section 4.01.01 applies only when there is a necessary suspension of the insured's business as a result of direct physical loss of or damage to property caused by a 'covered cause of loss' at the location[, and] it does not appear that the presence of the COVID-19 virus constitutes direct physical loss or damage to property") and civil or military authority losses ("it does not appear that the presence of the COVID-19 virus constitutes direct physical loss or damage to property").

227.    The ROR Letter reserved Zurich's right to deny Texas Clothing's Claim under the civil or military authority provision, stating the "it [was] unclear at [that] time whether the order of civil authority

affecting Texas Clothing[] resulting from any direct physical loss or damage within the distance limit of 1 mile".  Zurich also argued that "[t]o the extent it is Texas Clothing['s] position that its loss of income of the enforcement of any loss, ordinance, regulation or rule regulating or restricting the use of any property, including, but not limited to, the decision to close certain locations, cancel events, or limit the number of individuals who could attend events or premises, any loss may be excluded pursuant to [the Law/Ordinance] exclusion" in the Policy, effectively rendering the Policy's civil or military coverage meaningless a result not permitted by Texas law.

228.    The ROR Letter also noted that "to the extent any order of civil or military authority was issued because of the presence of the COVID-19 virus or to stop the spread of COVID-19 virus, the order may not have resulted from a 'Covered Cause of Loss'", reserving its right to deny coverage under for the Claim under the Contamination Exclusion contained in the Policy, arguing that "[t]he presence of the COVID-19 virus falls within the definition of **Contamination**", without mentioning that this exclusion is deleted by the Virus Deletion Endorsement or that the exclusion applies only to traditional environmental pollution .

229.    The ROR Letter closed by reassuring Texas Clothing that Zurich was "continuing [its] investigation of [Texas Clothing's] claim" and would "provide [Texas Clothing] with [its] coverage position as soon as [Zurich's] investigation [was] complete" and included several additional information requests from Texas Clothing to that end.  Specifically, Zurich asked Texas Clothing to provide the following information:

> 1. List of US locations being claimed.
>
> 2. If there is any evidence of the presence of COVID-19 at any locations.
>
> 3. If there is any evidence of physical damage at any locations as a result
> of COVID-19.

230.    On July 6, 2020, Zurich through Ms. Miller, sent a follow up email regarding the information requests contained in the ROR Letter but asking for no new or additional information from Texas Clothing, and again assuring Texas Clothing that Zurich "realize[d] times continue to be difficult and every [sic] changing," encouraging Texas Clothing to "please take [its] time" (the "Fourth Email").

231.    Despite these assurances, On August 18, 2020 and September 14, 2020, Zurich through Ms. Miller sent Texas Clothing emails, noting Texas Clothing spoke with Zurich in late July where the parties "reviewed how coverage affects the claim/details" and asking for a status update regarding Texas Clothing's progress in compiling the details of the Claim.  And on October 12, 2020, Zurich sent Texas Clothing an email through Ms. Miller informing Texas Clothing that if it did not respond to Zurich's email by October 27, 2020, she would "be moving [Texas Clothing's] claim to inactive status" (the "Fifth Email").

232.    On the same day, Texas Clothing responded to Zurich through an email by Mr. Joseph and informed Ms. Miller that Texas Clothing was "still in the midst of the effects of the pandemic on [its] business, particularly the effects on the business of our retail outlet stores."  He reaffirmed that Texas Clothing was "not shelving this claim." (the "October Email").  Ms. Miller acknowledged the October Email by email on October 14, 2020.  The same day Mr. Joseph reassured Ms. Miller that Texas Clothing had not forgotten about the Claim.

233.    Despite its repeated assurances for patience and continued acknowledgment of the difficulties Texas Clothing was suffering as a result of Coronavirus and COVID-19, Zurich sent additional follow up emails on November 9, 2020 and December 8, 2020 pressing Texas Clothing for the information, without sending any additional information requests.

234.    On February 8, 2021, in the midst of dealing with massive losses to its business as a result of Coronavirus and COVID-19, Texas Clothing responded to Zurich's information requests in an email from Mr. Joseph, "attach[ing] information focused on [its] US Retail business interruption due to the COVID-19 pandemic." (the "February Email").  Mr. Joseph noted Texas Clothing was "still working on gathering information of the impacts on other aspects of Haggar's business, but [that] the retail business was most directly and pervasively affected."  The information provided to Zurich included "the list of all stores in the US that were operating at January 1, 2020", "Closing Details" for the stores, three stores that closed due to Coronavirus and COVID-19 "but did not reopen because the leases expired", sales impact for each store caused by Coronavirus and COVID-19, and "PPE Costs [–] the aggregate costs by month for all store of PPE, including cleaning supplies".

235.    On March 16, 2021, less than a month after receiving the extensive information provided by Texas Clothing and without ever sending an adjuster to visit any of the Stores or otherwise conducting a substantive investigation of the Texas Clothing Claim, Texas Clothing received a letter from Zurich denying coverage for the Texas Clothing Claim based on several specious ground (the "Denial Letter").

236.    Zurich started the Denial Letter by mischaracterizing Texas Clothing's Claim as primarily "seeking coverage under the civil authority provision for the impact on business during the period of time the insure[d] locations were affected by an order of civil authority issued in connection with the recent outbreak of the COVID-19 virus" and "concluded that the Policy does not provide coverage for the loss of revenue and extra expenses associated with the civil authority closure of Texas Clothing['s] business worldwide. These statements and any other contention by Zurich that Texas Clothing's losses are not covered under the Policy because the closure of Texas Clothing's Stores was caused by the government orders and not Coronavirus, are the product of Zurich's failure to investigate the Claim and Zurich's rush to its preordained conclusion of denying the Claim as it has, upon information and belief, denied every similar claim by its all-risk policyholders in Texas and across the United States.

237.    In point of fact, as set forth above: (a) Texas Clothing closed approximately 65 of its Stores prior to any government orders requiring it to do so; and (b) with respect to the approximately 9 Texas Clothing Stores for which governmental entities issued closure orders prior to or at the same time as Texas Clothing deciding to closing them, as Zurich has admitted in its own court filings in COVID-19 business interruption cases where it has attempted to enforce exclusions it contended barred coverage for losses arising from viruses, the cause of those business closures was Coronavirus and COVID-19 - not government orders.

238.    Notwithstanding Zurich's failed attempts to pigeonhole Texas Clothing's losses as solely arising under the civil or military coverage provision, the Zurich Denial Letter still denies coverage for the Claim under that coverage provision. Instead, Zurich argued that: (1) "[t]he presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property", and (2) "to the extent any order of civil or military authority was issued because of the COVID-19 virus or to stop the spread of COVID-19, such order would not be the result of a 'Covered Cause of Loss'", relying in large part on the

Contamination Exclusion within the Policy.

239.    Zurich's denial of Texas Clothing's Claim under the Policy's Time Element Provision also focused on the Policy's undefined trigger phrase, stating "there does not appear to be any claim for direct physical loss of or damage to property at an Insured Location [and] [i]n any event, the presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property."  Zurich leapt to this conclusion despite never visiting a single one of Texas Clothing's Stores to verify the accuracy of its assertion and despite Zurich's website postings about the physical nature of Coronavirus and how "proper cleaning and disinfection of surfaces can help minimize the spread of the virus" – postings that remain on Zurich's website even today.[133]

240.    Moreover, Zurich's reliance on the Contamination Exclusion found within the Policy as a basis for denying Texas Clothing's Claim without mention that the exclusion is deleted by the Virus Deletion Endorsement or that the exclusion applies only to traditional environmental pollution, flies in the very face of Zurich's assurances of fair and accurate evaluation of Texas Clothing's Claim.

## COUNT ONE

### (Declaratory Judgment)

241.    Texas Clothing incorporates the above Paragraphs by reference.

242.    This is a cause of action for declaratory judgment pursuant to Fed. R. Civ. P. § 57 and 28 U.S.C. § 2201.

243.    An actual and justiciable controversy exists between Texas Clothing and Zurich concerning their respective rights and obligations under the Policy.

244.    The issuance of a declaratory judgment by this Court is necessary to resolve the existing controversy among the parties

245.    As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and obligations of Texas Clothing and Zurich under the Policy.

---

[133] *Cleaning and Disinfecting Plans During COVID-19 Outbreak,* Zurich (May 19, 2020), https://www.zurich.com/en/knowledge/topics/covid-19/cleaning-and-disinfecting-plans-during-ovid-19-outbreak (last visited Mar. 9, 2022).

246.    Texas Clothing seeks a declaratory judgment declaring that the losses it has suffered are covered by the Policy.

247.    Texas Clothing seeks a declaratory judgment declaring that Zurich is responsible for fully and timely paying the Texas Clothing Claim.

## COUNT TWO

### (Breach of Contract)

248.    Texas Clothing incorporates the above Paragraphs by reference.

249.    The Policy is a valid and enforceable contract.

250.    Texas Clothing paid substantial premiums for the and the promises of coverage contained therein, and otherwise performed all of its obligations owed under the  Policy or was excused from performance.

251.    Zurich has denied coverage for the Texas Clothing Claim under all coverages of the Policy. As such Zurich breached its contract (The Policy).

252.    As a result of Zurich's breach of contract, Texas Clothing has suffered and continues to suffer damage in an amount to be proven at trial, but currently estimated to exceed $50 million.

**WHEREFORE**,  Plaintiff Texas Clothing demands judgment against Zurich as set forth below:

A.    On the First Claim for Relief, a declaratory judgment that the losses Texas Clothing and its subsidiaries have suffered are covered by the Policy; and that Zurich is responsible for fully and timely paying Texas Clothing's losses;

B.    On the Second Claim for Relief, for an award of damages in favor of Texas Clothing against Zurich in an amount to be proven at trial, plus pre- and post-judgment interest at the maximum legal rate, attorneys' fees, costs and disbursements for this action;

C.     For such other equitable and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure § 38(b), Texas Clothing demand a trial by jury.


DATED:  March 14, 2022                    Respectfully submitted,



                                        **LOEWINSOHN DEARY SIMON RAY LLP**

                                        By:  */s/ Alan S. Loewinsohn*
                                             Alan S. Loewinsohn
                                             State Bar No. 12481600
                                             alanl@ldsrlaw.com
                                             Kerry Schonwald
                                             State Bar No. 24051301
                                             kerrys@ldsrlaw.com
                                             12377 Merit Drive, Suite 900
                                             Dallas, Texas  75251
                                             Telephone: (214) 572-1700
                                             Fax: (214) 572-1717


                                        **ATTORNEYS FOR PLAINTIFF**