UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS CLOTHING HOLDING CORPORATION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-0590-x |
| ZURICH AMERICAN INSURANCE COMPANY, | § § § | |
| *Defendant*. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Zurich American Insurance Company's ("Zurich") motion to dismiss Plaintiff Texas Clothing Holding Corporation's ("Texas Clothing") complaint [Doc. No. 13], as well as Texas Clothing's motion for leave to file notice of supplemental authority [Doc. No. 31]. For the following reasons, the Court **DENIES** Texas Clothing's motion for leave to file notice of supplemental authority, **GRANTS** Zurich's motion to dismiss, and **DISMISSES WITH PREJUDICE** Texas Clothing's complaint.

## I. Background

Texas Clothing sells clothing and accessories at physical store locations across the nation. At the outbreak of the COVID-19 pandemic, Texas Clothing operated seventy-four stores in twenty-nine states; today, it operates sixteen stores in nine states.

Texas Clothing "maintain[ed] 'all-risk' commercial property coverage" from Zurich from November 2019 to November 2020 ("the Policy").[1]  The Policy insured against "all risks of direct physical loss of or damage from any cause unless excluded" as well as "the necessary [s]uspension of the Insured's business activities . . . due to direct physical loss of or damage to [p]roperty."[2]  The Policy does not define "physical loss of or damage" to property.

Texas Clothing states that the presence of coronavirus "causes physical loss of or damage to property by physically changing and physically altering property . . . just as if asbestos, ammonia, radon gas, cat urine, fumes, sulfuric gases emitted from Chinese drywall, carbon monoxide, mold, or salmonella were in the air or on surfaces of the premises."[3]  The mere existence of the virus "in and on property, including in indoor air, on surfaces, and on objects," Texas Clothing alleges, "renders the property unsafe, uninhabitable[,] and unfit for its intended" use.[4]  Texas Clothing believes that, because "[c]oronavirus cannot be removed by routine surface cleaning," its presence in stores "transform[ed] [Texas Clothing merchandise] into hazardous material."[5]  And further, when Texas Clothing's stores eventually reopened, "[t]he reduced hours, reduced capacity, and significant restrictions . . . , some imposed by government orders, [] deprived Texas Clothing of the full functional use of its

---

[1] Doc. No. 1 at 9.

[2] *Id.* at 50–51 (cleaned up) (emphasis omitted).

[3] *Id.* at 27.

[4] *Id.* at 28.

[5] *Id.* at 28, 30.

property, causing further direct physical loss of or damage to Texas Clothing's property."[6]  As a result of all this, Texas Clothing claims losses that "exceed $50 million."[7]

 In May 2020, Texas Clothing notified Zurich that it was making claims under the Policy for its COVID-19-related losses.  Zurich responded that it was unclear whether "the presence of the COVID-19 virus constitutes direct physical loss or damage to property" sufficient to trigger coverage.[8]  Eventually, Zurich denied coverage.

Texas Clothing sued Zurich, seeking a judgment "declaring that the losses it has suffered are covered by the Policy" and that "Zurich is responsible for fully and timely paying" the claim.[9]  Texas Clothing also alleges breach of contract and seeks damages, pre- and post-judgment interest, and attorney's fees and costs.[10]

Zurich now moves to dismiss Texas Clothing's complaint, arguing that Texas Clothing failed to plead facts showing that it suffered "direct physical loss of or damage" to its property, and in the alternative, that several of the Policy's specified exclusions provide a basis for dismissal.[11]

---

[6] *Id.* at 46.

[7] *Id.* at 47.

[8] *Id.* at 69–70.

[9] *Id.* at 74.

[10] *Id.*

[11] Doc. No. 14 at 8.

## II. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), the Court evaluates the pleadings by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff."[12] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[13] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14] Although the plausibility standard does not require probability, "it asks for more than a sheer possibility that a defendant has acted unlawfully."[15] In other words, the standard requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."[16] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[17]

## III.  Analysis

"[P]roperty insurance coverage is triggered by some threshold concept of physical loss or damage to the covered property," which "is widely held to exclude alleged losses that are intangible or incorporeal," such as "a detrimental economic

---

[12] *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[14] *Id.*

[15] *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

[16] *Iqbal*, 556 U.S. at 678.

[17] *Id.* (quoting *Twombly*, 550 U.S. at 555).

4

impact unaccompanied by a distinct, demonstrable, physical alteration of the property."[18]  The Texas Supreme Court has not decided whether policies like the one at issue here "cover business interruption losses due to civil authority orders," but the Fifth Circuit, venturing an "*Erie* guess," predicted that a restaurant forced to suspend in-person dining had not suffered "a direct physical loss of property" sufficient to trigger its insurance coverage under identical policy language.[19] Similarly, forced closure "is not a tangible alteration or deprivation of *property*" when "[n]othing tangible happen[s]" to the property itself.[20]  The Fifth Circuit's view is shared by the Second, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits.[21]  These courts fended off a host of inventive attempts to linguistically shoehorn COVID-19-related claims into the same or substantially similar policy

---

[18] *Hartford Ins. Co. v. Miss. Valley Gas Co.*, 181 F. App'x 465, 470 (5th Cir. 2006) (per curiam) (cleaned up); *see Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 270–71 (5th Cir. 1990) ("The language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state—for example, the car was undamaged before the collision dented the bumper.").

[19] *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 454–55 (5th Cir. 2022).  For the record, this judge really likes Terry Black's Barbecue.  Barbecue aside, "a contract is a contract is a contract."  ROALD DAHL'S MATILDA THE MUSICAL (TriStar Pictures, Working Title Films, & The Roald Dahl Story Company 2022).

[20] *Aggie Invs., L.L.C. v. Continental Cas. Co.*, No. 21-40382, 2022 WL 257439, at *2 (5th Cir. Jan. 26, 2022) (per curiam).

[21] *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 21 F.4th 216, 222 (2d Cir. 2021) (applying New York law); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022) (applying West Virginia law); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401–02 (6th Cir. 2021) (applying Ohio law); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 332–33 (7th Cir. 2021) (applying Illinois law); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1143–44 (8th Cir. 2021) (applying Iowa law); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 15 F.4th 885, 892 (9th Cir. 2021) (applying California law); *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 710–11 (10th Cir. 2021) (applying Oklahoma law); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021) (applying Georgia law).

language, and Texas Clothing deploys many of the same arguments, which fail now for the same reasons they failed in the past.[22]

But Texas Clothing leans primarily on one COVID-19-related loss that marks perhaps the most audacious attempt yet: "The presence of [c]oronavirus in and on property, including in the indoor air, on surfaces, and on objects, causes physical loss of or damage to property by physically changing and physically altering property[.]"[23] In other words, Texas Clothing asserts that "viral droplets," "[r]espiratory particles," and "airborne aerosols" can "transform[] . . . surfaces" and "physically chang[e]" objects enough to establish direct physical loss or damage.[24] To demonstrate the metamorphic powers of coronavirus particles, Texas Clothing spends nearly half its complaint reciting scientific studies—including extensive diagramming—that purport to demonstrate how exhaled particles might travel through the air and

---

[22] *Compare, e.g.*, Doc. No. 26 at 28–29 (claiming covered loss or damage due to civil or military authority), *with United Air Lines, Inc. v. Ins. Co. of Penn.*, 439 F.3d 128, 134 (2d Cir. 2006) (holding civil authority coverage inapplicable because the government did not act "as a direct result of [the] damage[s]" claimed but rather as protection against a different threat); Doc. No. 26 at 17 (claiming the Policy's use of "or" "requires that 'loss' and 'damage' be distinct from one another"), *with Oral Surgeons*, 2 F.4th at 1143–44 (rejecting insured's targeting of policy's disjunctive "or" to argue that "loss" could trigger the policy without "physical damage"); Doc. No. 26 at 16 (arguing that the Policy's exclusion of "contamination from [] an invisible energy field," like radiation, evidences its contemplation of other "non-tangible harm"), *with Sandy Point*, 20 F.4th at 333 (rejecting the same argument where "[t]he Policy [was] replete with textual clues that reinforce the conclusion that 'direct physical loss' requires a physical alteration to property" and because the contention that nuclear radiation has no physical effect is "incorrect"); Doc. No. 26 at 16 (claiming that the Policy's trigger "include[s] a material deprivation of use for a property's intended purpose," regardless of physical damage), *with Mudpie*, 15 F.4th at 891 (rejecting the argument that a similar policy "merely require[d] that the property no longer be suitable for its intended purpose" and affirming denial of coverage because the "complaint d[id] not identify a distinct, demonstrable, physical alteration of the property" (cleaned up)).

[23] Doc. No. 1 at 27; *see also NTT DATA Int'l LLC v. Zurich Am. Ins. Co.*, No. 3:21-CV-890-S, 2022 WL 196533, at *5 (N.D. Tex. Jan. 21, 2022) (Scholer, J.) (collecting cases unsuccessfully asserting the same argument).

[24] Doc. No. 1 at 27–28.

contaminate surfaces.[25]   And it exhaustively tracks data indicating that such particles were, in fact, introduced into the air at its stores.[26]

Texas Clothing's mental gymnastics are the same sort that, if left unchecked, could hoodwink a court into believing that wheat grown in one's own backyard for personal consumption will substantially affect interstate commerce.  The Court can almost hear the curious logic of the opinion that might result from this line of reasoning: "[E]ven if [coronavirus's] activity be local and though it may not be regarded as [causing damage], it may still, whatever its nature, be reached by [the Policy] if it exerts a substantial [damaging] effect [according to a flurry of self-serving scientific studies]."[27]   Thankfully, such ethereal and highbrow reasoning does not apply to contracts covering physical damage to property.  Microscopic particles floating around inside a clothing store might substantially affect interstate commerce under the logic of some court cases, but they cannot trigger the Policy in question because they do not cause physical loss or damage.

Even if the Court could be sure that coronavirus particles contacted and physically affected the property in question, no compilation of peer-reviewed, academic incantations can beguile the Court into accepting Texas Clothing's key premise that coronavirus particles "*cannot be removed*" once they enter an airspace

---

[25] *See id.* at 9–40.

[26] *Id.* at 33–38.

[27] *See Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if [the wheat farmer's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce[.]").

or settle on a surface.[28]  "Studies have demonstrated," Texas Clothing urges, that "even intense, non-routine surface cleaning does not remove it from surfaces—let alone from the air."[29]  None of Texas Clothing's "surface cleaning measures" has successfully "remove[d] [c]oronavirus from the room air," and "in fact, many actually exacerbate the damage."[30]  And the argument extends to merchandise: The "virus can survive on fabrics and be transferred to skin," so, because it "was dispersed onto and into the very fabric of Texas Clothing's merchandise," it "transform[ed] [it] into hazardous material."[31]  Even if cleaning were possible, the argument ominously concludes, "the continuous reintroduction of [c]oronavirus by infectious persons into a publicly open indoor space renders cleaning, ventilation interventions[,] and even dissipation over time futile."[32]  In short, Texas Clothing presses the Court to rule that airborne germs alighting on property can cause physical loss and damage to that property.[33]

---

[28] *Id.* at 28 (emphasis added).  Texas Clothing hedges a bit, saying that coronavirus particles "cannot be removed *by routine surface cleaning*," but this qualifier cannot disguise the central premise of Texas Clothing's argument: that no possible cleaning regimen could remove the virus.  *Id.* (emphasis added).  If Texas Clothing conceded that any feasible amount of cleaning could remove the virus, its argument that the virus caused "loss" and "damage" would collapse.

[29] *Id.* at 31.

[30] *Id.*

[31] *Id.* at 30.  Texas Clothing states that all of its stores have reopened, and it does not explain why it is selling "hazardous material" to its customers.

[32] *Id.* at 32.

[33] If this sincerely is the view of Texas Clothing, the Court wonders how anyone at Texas Clothing avoided starvation during the pandemic.  After all, this view of the enduring nature of COVID-19 would certainly preclude any adherent from eating food prepared by or purchased from others for fear of contact with COVID-19.

Dr. Fauci doesn't appear to believe the Texas Clothing type of argument,[34] and the Court refuses to open Pandora's Kleenex Box by entertaining it now.[35] The Fifth Circuit has defined "physical" as "requir[ing] tangible alterations to property" and "loss" as "perdition, ruin, [and] destruction."[36] The Court will not cheapen those definitions by expanding them to encompass the potential consequences of indoor breathing. "COVID-19 is a virus that injures people, not property."[37] If we know anything from the 13th Amendment, people are not property. Texas Clothing's

---

[34] *See* Erika P., *Dr. Fauci Says to Focus on Hand Hygiene Instead o[f] Wiping Grocery Bags*, THE SCIENCE TIMES (Oct. 28, 2020), https://www.sciencetimes.com/articles/27933/20201028/dr-fauci-focus-hand-hygiene-instead-wiping-grocery-bags.htm (Fauci: "[T]he fact that the virus can live on inanimate objects does not necessarily mean that it greatly affects coronavirus transmission; it is only a minor aspect[.]"); *but see* Marlene Cimons, *How Fauci, 5 other health specialists deal with covid-19 risks in their everyday lives*, THE WASHINGTON POST (July 3, 2020), https://www.washingtonpost.com/health/how-fauci-5-other-health-specialists-deal-with-covid-19-risks-in-their-everyday-lives/2020/07/02/d4665ed6-b6fb-11ea-a510-55bf26485c93_story.html (Fauci: "[After grocery shopping,] I will take the materials out of the bags, then wash my hands with soap and water, and then use Purell, and let everything sit for a day. . . . I just bring the mail in, wash my hands, and then let it lie around for a day or two before I open it."); *but see SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (CDC: "[E]ach contact with a contaminated surface has less than a 1 in 10,000 chance of causing an infection."); *Surface Cleaning and COVID-19: What You Should Know*, WEBMD (Dec. 26, 2022), https://www.webmd.com/covid/how-long-covid-19-lives-on-surfaces ("[T]he risk of [spreading COVID-19 through surfaces] is very low. . . . Some people refer to the act of overcleaning as 'hygiene theater.'"); *see also Study Finds Most Americans Trust Dr Pepper Over Dr. Fauci*, THE BABYLON BEE (Aug. 14, 2020), https://babylonbee.com/news/study-finds-more-americans-trust-dr-pepper-than-dr-fauci ("While Dr. Fauci has made some questionable claims over the past few months, Dr Pepper hasn't made any erroneous predictions about the virus or recommendations[.]").

[35] *See Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2021 WL 2936066, at *6–7 (N.D. Tex. July 13, 2021) (Fitzwater, J.) (rejecting the argument "that COVID-19 causes property damage" because it "can be removed from surfaces by routine cleaning" and noting that, if the court held otherwise, "the presence of any contagious virus—e.g., the common cold or the flu—constitutes covered damage under the Policy to the extent it is harmful to human health").

[36] *Terry Black's*, 22 F.4th at 455–56 (cleaned up); *see also PS Bus. Mgmt., L.L.C. v. Fireman's Fund Ins. Co.*, No. 21-30723, 2022 WL 2462065, at *2 (5th Cir. July 6, 2022) (per curiam) ("When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written[.]" (cleaned up)).

[37] *PS Bus. Mgmt.*, 2022 WL 2462065, at *3 (cleaned up); *see also Ferrer & Poirot, GP v. Cincinnati Ins. Co.*, 36 F.4th 656, 656 (5th Cir. 2022) (per curiam) ("While COVID-19 has wrought great physical harm to people, it does not physically damage property[.]").

complaint cannot overcome the fact that, infinitesimal infiltrations notwithstanding, "[n]othing physical or tangible happened to" Texas Clothing's property as a result of the pandemic.[38]

Texas Clothing could have established direct physical loss or damage to its property by showing "a tangible alteration or deprivation of" that property, that it "was *deprived* of a physical space," or that it suffered "*loss of property*, not the loss of *use* of property."[39] But it didn't. The Court rejects Texas Clothing's view that short-lived, microscopic, aerial particles alighting on its merchandise and other surfaces tangibly altered its physical property enough to trigger coverage under the Policy's terms. And to the extent that government orders or imminent danger restricted the use of Texas Clothing's property, they did not wrest physical control of the buildings and merchandise from Texas Clothing. Finally, Texas Clothing's alternate theories of coverage under the Policy—suspension of business activities coverage, leasehold interest coverage, extra expense coverage, contingent time element coverage, and protection and preservation of property coverage[40]—all hinge on prerequisite physical loss or damage to property, so none apply.

---

[38] *Terry Black's*, 22 F.4th at 456; *see also Berkseth-Rojas v. Aspen Am. Ins. Co.*, No. 3:20-CV-0948-D, 2021 WL 2936033, at *5 (N.D. Tex. July 13, 2021) (Fitzwater, J.) (noting that cases dealing with physical loss or damage due to asbestos and smoke "do not broadly hold that the presence of any potentially harmful particles, like COVID-19, inside or on a property necessarily causes 'injury' to the property under the terms of a policy").

[39] *Terry Black's*, 22 F.4th at 456–58. Nor did Texas Clothing assert "that any part of its building or anything within it was damaged—let alone to the point of repair, replacement, or total loss." *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 21-1082-CV, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022).

[40] *See* Doc. No. 1 at 50–56.

As a final matter, Texas Clothing moves for leave to file notice of supplemental authority, flagging three cases from a Louisiana court of appeals, a Harris County district court, and the Vermont Supreme Court for the Court's review.[41]  "A movant seeking to file a supplemental brief must: (1) show that it has new information that was not available at the time it filed its motion . . . and (2) demonstrate that this information is relevant to the Court's analysis and would therefore aid the justiciable disposition of the case."[42]  These cases were unavailable when Texas Clothing filed its briefing on Zurich's motion to dismiss, so that prong is met.  But could they aid in the Court's analysis?  No.  The Fifth Circuit has already spoken.  So only an en banc Fifth Circuit case, a Supreme Court case, or a Texas Supreme Court case saying the Circuit's *Erie* guess was wrong would help Texas Clothing now.  And these aren't that.  The Court **DENIES** Texas Clothing's motion for leave to file notice of them.

The Policy does not cover Texas Clothing's loss, so the Court need not address Zurich's alternative argument that certain Policy exclusions preclude coverage.[43]  Because the Policy is inapplicable to Texas Clothing's claimed losses, "any amendment" to the complaint "would be futile."[44]  The Court "perceive[s] no set of

---

[41] Doc. No. 31 at 2; *see* Doc. No. 31-1 at 3–4 (citing *Cajun Conti LLC v. Certain Underwriters at Lloyd's, London*, 2021-0343 (La. App. 4 Cir. 6/15/22); 2022 WL 2154863, at *2, *writ granted sub nom. Cajun Conti LLC v. Certain Underwriter At Lloyd's, London*, 2022-01349 (La. 11/22/22); 350 So.3d 176; *Baylor Coll. of Medicine v. Underwriters at Lloyd's Syndicates*, No. 2020-53316 (Tex. Dist. Ct. Aug. 31, 2022); and *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, No. 21-173, 2022 WL 4396475 (Vt. Sept. 23, 2022)).

[42] *Silvas v. Equifax Info. Servs., LLC*, No. 3:19-CV-2932-K, 2020 WL 4000848, at *2 (N.D. Tex. July 15, 2020) (Kinkeade, J.) (cleaned up).  This marks the second time in a row this judge has favorably cited Judge Kinkeade.  This judge is now becoming increasingly worried he's getting it wrong.

[43] *See* Doc. No. 14 at 24–30.

[44] *Terry Black's*, 22 F.4th at 459.

facts in which [Texas Clothing] states a covered claim for its losses."[45] Texas Clothing cannot state a plausible claim to relief because it cannot "plead[] factual content that allows the [C]ourt to draw the reasonable inference that [Zurich] is liable for the misconduct alleged."[46] In line with the Fifth Circuit's conclusion in *Terry Black's*, dismissal with prejudice is the proper result.[47]

## IV.   Conclusion

For the foregoing reasons, the Court **DENIES** Texas Clothing's motion for leave to file notice of supplemental authority, **GRANTS** Zurich's motion to dismiss, and **DISMISSES WITH PREJUDICE** Texas Clothing's complaint.

**IT IS SO ORDERED** this 27th day of February, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[45] *Id.* at 460.

[46] *Iqbal*, 556 U.S. at 678.

[47] *Terry Black's*, 22 F.4th at 459–60.